2016 IL App (1st) 141033

SIXTH DIVISION
December 30, 2016

No. 1-14-1033

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County. |
| | ) | |
| v. | ) | No. 08 CR 5530 |
| | ) | |
| HERMAN BURNETT, | ) | Honorable |
| | ) | Maura Slattery Boyle, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE DELORT delivered the judgment of the court with opinion.
Justices Cunningham and Rochford concurred in the judgment.

**OPINION**

¶ 1     A jury found defendant Herman Burnett guilty of first degree murder and vehicular hijacking.  The trial court imposed consecutive sentences of 50 years' imprisonment for first degree murder and six-years' imprisonment for vehicular hijacking.  On direct appeal, defendant raises numerous claims.  We reverse and remand this case for a new trial.  We find the trial court committed error when it refused to instruct the jury as to an insanity defense, and on remand defendant should be allowed to *voir dire* the jury regarding insanity, and present relevant admissible evidence as to the defense.

¶ 2                                    BACKGROUND

¶ 3     On February 26, 2008, defendant entered a minivan parked at a gas station located at 95th and State Streets in Chicago.  The original driver, Eric Holmes, had left the minivan with the keys inside and the engine running.  Defendant began to drive out of the parking lot.  Holmes ran alongside and caught up to the van, announced that the van belonged to him, and jumped onto

the outside of the vehicle. Defendant drove onto the Dan Ryan Expressway, while Holmes attempted to enter the van through the passenger-side door. Defendant veered through a number of lanes and crashed the van into a concrete barrier wall. The collision fatally injured Holmes.

¶ 4 The State charged defendant by indictment with five counts of first degree murder, three of which were premised upon a separate charge of vehicular hijacking. The State also charged defendant with possession of a stolen motor vehicle (PSMV) and burglary. The State entered a *nolle prosequi* on one of the murder charges and the charges for PSMV and burglary.

¶ 5 During pretrial proceedings, defense counsel requested that defendant be examined for fitness to stand trial on multiple occasions. On January 22, 2010, the trial court ordered Forensic Clinical Services (FCS) of the circuit court of Cook County to examine defendant for fitness to stand trial and fitness to stand trial with medication.

¶ 6 In a letter dated April 6, 2010, Dr. Fidel Echevarria, an FCS staff psychiatrist, found defendant mentally fit to stand trial with medication. Dr. Echevarria determined that defendant verbalized understanding of the charges, the nature and purpose of the court proceedings against him, and the roles of various courtroom personnel.

¶ 7 At a May 11, 2010 fitness hearing, Dr. Echevarria testified that defendant told him that he previously had been diagnosed with depression, bipolar disorder, and schizophrenia. Dr. Echevarria had a significant amount of records from defendant because he had evaluated him before on a different charge for fitness in another case. At the time of the evaluation in this case, defendant was taking an antidepressant medication, Sertraline, and an antipsychotic medication, Risperdal. Dr. Echevarria stated that in his medical opinion, defendant was mentally fit to stand trial with medication. On cross-examination, Dr. Echevarria testified defendant's medical history showed he experienced auditory or visual hallucinations. The trial court found defendant

fit to stand trial with medication on May 17, 2010, stating that whether defendant had taken medication at the time of the incident was "an issue for another day."

¶ 8    On October 19, 2010, defense counsel requested another evaluation to determine defendant's fitness to stand trial and sanity at the time of the offense.  After a second evaluation, Dr. Echevarria determined defendant was fit to stand trial with medication, but deferred submitting a formal opinion regarding defendant's sanity due to an incomplete data base.  On April 8, 2011, Dr. Echevarria submitted a report finding defendant was legally sane at the time of the offense, which stated that "[t]here were neither subjectively reported nor objectively documented symptoms of a mental disease and/or defect at the time of the offense which would have impaired Mr. Burnett's appreciation of the alleged criminality of his conduct."  In addition to Dr. Echevarria's findings, Dr. Christofer Cooper, an FCS licensed clinical psychologist, conducted two independent psychological evaluations addressing defendant's sanity.  Dr. Cooper also found defendant legally sane at the time of the offense.

¶ 9    At a hearing on September 29, 2011, defense counsel expressed concern after having met with defendant twice in one week, stating "[w]e have not had a conversation where my client I believe was lucid and coherent and understood what I was saying to him."  She stated that defendant was "in no position to help me prepare a defense in his case" and that he was regressing.  The trial court granted defense counsel's request for another fitness evaluation by an independent psychiatrist, Dr. Roni Seltzberg.

¶ 10    On February 13, 2013, Dr. Seltzberg submitted a report to defense counsel finding that defendant was not mentally fit to stand trial.  Dr. Seltzberg stated that defendant "demonstrated a very significant psychotic thought disorder of both form and content, was frequently unable to responsively communicate, instead answering tangentially, reflecting delusional preoccupations,

auditory hallucinations and distorted reality testing." According to Dr. Seltzberg, "[w]ith appropriate psychiatric intervention in a secure forensic facility, there is a reasonable probability of his attaining fitness for trial within the statutory period of one year." Due to defendant's mental status at the time of her evaluation, Dr. Seltzberg deferred her opinion regarding his sanity at the time of the offense.

¶ 11 At a March 13, 2013 hearing, the State requested an outside expert to evaluate defendant. The trial court denied the State's request and ordered FCS to conduct a reevalution of defendant. Dr. Seltzberg submitted an updated opinion on April 22, 2013, finding defendant fit to stand trial with medication.

¶ 12 On April 25, 2013, the parties stipulated to the parties' expert reports regarding defendant's fitness to stand trial with medication. The trial court stated that it also had an opportunity to observe defendant. The court stated defendant "does answer questions appropriately" and that "based on the medical determination, as well as the observations of the Court and the stipulation by and between the parties, Mr. Burnett is fit to stand trial with medication."

¶ 13 Defendant filed an amended answer to discovery giving notice that he was asserting the affirmative defenses of insanity and self-defense on September 11, 2013. He also filed a motion to suppress statements that he made to law enforcement officials after he crashed the van. Defendant argued that due to his psychological condition, he was incapable and unable to appreciate the full meaning of his *Miranda* rights. In addition, defendant stated that after he was taken into custody, he had not taken any of his medication, which he was supposed to take twice daily. Defendant was in custody for over nine hours before law enforcement officials first spoke to him. He asserted that he was under the influence of crack cocaine and marijuana at the time of

his arrest. He also argued that he had previously been found unfit to stand trial and had been hospitalized in many facilities over the past 15 years.

¶ 14    On September 13, 2011, the trial court heard argument on defendant's motion and the State's motion *in limine*, which sought to prohibit defendant from presenting evidence of his mental health history and from introducing and commenting in argument on any of his hearsay statements. In support of the State's motion, Illinois State Police (ISP) Special Agent Krista Thien testified on direct examination that she was working with her partner, Special Agent Renee Phillips, on February 26, 2008. She received a call to investigate a possible reckless homicide incident on the Dan Ryan Expressway. Before questioning defendant, Special Agent Thien spoke to several witnesses who gave their own accounts of the incident. At 2:30 a.m. the following morning, Special Agents Thien and Phillips advised defendant of his *Miranda* rights. Defendant signed and initialed a preprinted waiver form indicating he understood his *Miranda* rights. They began to interview and continued questioning him over the course of the next 22 hours.

¶ 15    When defendant first began speaking to Special Agent Thien, he voluntarily stated that he was not the driver of the van. Defendant did not appear to be in any physical distress and did not request medical attention. Special Agent Phillips attempted to clarify defendant's name because he had originally told law enforcement officials that he was Jamie Sampson. Defendant told Special Agent Thien his address, age, place of birth, and where he went to school. He also told her that he paid $4 to the victim for a ride. Then he stated that he was "NGRI [not guilty by reason of insanity]." He described his mental health history and the medications he needed to take. Special Agent Thien told defendant that a witness saw him driving the van. Defendant continued to deny that he was the driver. He refused to take a polygraph test. An hour after the

interview began, defendant stated "he want[ed] to have a couple of his rights." The agents stood up to leave the room, but defendant continued to talk. Defendant insisted that the agents record his story in writing. Shortly thereafter, defendant stopped talking and the agents left the room.

¶ 16    Special Agents Thien and Phillips returned the following evening and asked defendant if he wanted to talk. Initially, he refused, but changed his mind 10 minutes later. They readvised defendant of his *Miranda* rights and he indicated that he understood that he previously signed the waiver form. Defendant told the agents that he "wanted to get it over with" and that he did not want to talk "too much," but continued the interview. Defendant repeated that he was "NGRI" and asked the agents if they were his attorneys. Defendant maintained that he was not the driver of the van. He told the agents that "he wants his rights," but did not clarify which right he wanted. He refused to provide the agents with a buccal swab. They questioned defendant regarding a bald spot on his head because a witness recalled that the person driving the van had a bald spot. The agents took photographs of the top of defendant's head. The agents stopped the interview at 10:08 p.m. Special Agent Thien testified that she never doubted defendant's mental capacity to answer her questions.

¶ 17    On cross-examination, Special Agent Thien stated that her partner had indicated that she had difficulty understanding defendant during the interview. Defendant mentioned his "medicine place" and psychiatrist in Joliet and Elgin. He told the special agents that he suffered from schizophrenia and bipolarity, which he described as "[w]hen one part of your, uh, important part of you, know, comprehends the fullness of stuff." Defendant continued to describe his mental illness as "what make you, uh, I'm sorry, as in memory bank of something. If one of them is shortened, if you shortened them, one of your things, then that meant that. And I've shortened up so much." Neither of the special agents stopped the interview to get more

6

information regarding defendant's mental health history or obtain his medications. Defendant indicated that he had taken his medication before he was taken into custody.

¶ 18    When Special Agent Thien confronted defendant with witnesses' statements that he had been driving the van, he told her "Y'all should have lots of people saw me driving, like Big Foot at McCormick Place. Rosemont Horizon, they ran me off. Then I drove, but nobody saw me driving. Oh, two people had seen me driving, and plus, I know who was driving." When the special agents continued to question defendant about whether he was driving, he responded, "I lit up a cigarette, 'cause this is such a crisis, and you don't like crisis and stuff so," and "[y]ou're trying to come down on me. Then don't crack down on me so hard 'cause I got in the passenger side and usually people be -- we had the keys. We don't understand the rest." The special agents did not ask defendant questions to clarify his reference to "we" or "crisis." Defendant insisted three other people were in the van.

¶ 19    Several hours later, the special agents returned and continued to question defendant after advising him again about his *Miranda* rights. Defendant responded, "I don't want to talk about it too much." When defendant told the special agents he was "NTRI" and "went to court," Special Agent Phillips asked him whether he thought he was insane. Defendant told the special agents, "that's what the hospital told me, um, and I'm not that much insane but something bad just happened. It was excellent. Yeah, I just woke up." When questioned further about whether a bad accident occurred, defendant responded, "Nah, I don't know too much what happened, because what happened, I was just mix it to you, and what are you, are you my lawyer?" The special agents did not investigate further defendant's mental health condition and told him that they were not his lawyers.

¶ 20   On redirect examination, Special Agent Thien testified she did not follow up on defendant's mental health history because he was answering questions. After hearing argument, the trial court requested a copy of the interrogation video and stated that it would take defendant's motion to suppress under advisement.

¶ 21   The parties then addressed the State's multipart motion *in limine*. The trial court allowed the State to impeach defendant regarding his prior convictions for PSMV, possession of burglary tools, and retail theft, but barred an obstruction of justice conviction. The trial court also raised the issue of whether an insanity defense had been pled. Defense counsel responded that defendant filed an amended answer to discovery alleging an insanity defense. The trial court reviewed the amended answer and then stated:

> "No, no, no. In addition, this Defense may allege that the Defendant was insane at the time of the offense. No. That is not how it's done. It is definitively declared.
>
> You can't go reasonable doubt or insane. It's not -- it doesn't work that way. It's not how it's presented.
>
> If you are -- if somebody is proceeding under the affirmative defense of an individual who was insane at the time of the alleged occurrence, that needs to be clearly alleged. It's not in the alternative. So this is not properly filed."

The trial court deferred ruling on the remaining motions until the next hearing.

¶ 22   On September 16, 2013, the trial court denied defendant's motion to suppress, finding that he understood his rights under *Miranda*. The court also addressed defendant's attempt to raise the insanity defense. The court stated:

"[T]here was the motion that we left off Friday about in the alternative that Mr. Burnett was not legally sane at the time of the offense and the Court had indicated to the parties that this was not properly pled. It's not though as an affirmative defense though it is a defense to the act and what you're saying here, and this is where the Court is confused ***, one hypothesis or one approach is that the State did not prove it beyond a reasonable doubt. Understood. But by going by the second one it's like, okay, but he did do it but he wasn't legally sane. So there's a clear -- a clear separation in -- in admittance under one theory not guilty, under the other theory guilty but I didn't have the requisite intent or I was legally insane at the time so, you know, that's quite a dichotomy.

So you can, of course, plead it but -- I mean you can, of course, put that out there but you have to understand the Court on its own ruling in motion in limine none of that comes in as regards to his sanity at that opening statement until you in your case in chief somehow then present evidence. So when you're making your opening statements, you cannot then say, well, they're not going -- he didn't have the requisite intent or he was under medication or he was under treatment or he was under previous doctor care. That does not come in until you have met the threshold level in your case.

You have an additional problem because your own doctor says he's fit. So the Court is of the opinion and is a little bit concerned that your own expert, that this is the defense you want to present, and I'm not limiting you in any way, present it how you want, but you have one doctor -- your own doctor says he's fit.

> You have -- again you handle your case however you want but I'm just pointing
>
> out some very important things I think."

The trial court also denied a defense motion *in limine* to prevent the State from eliciting the fact that defendant gave an alias when first arrested.

¶ 23    On September 23, 2013, defendant's jury trial began.  The defense proffered *voir dire* questions addressing bias with regard to mental illness and the insanity defense, and again requested that defendant's mental state be raised in opening statement.  The trial court denied the proposed *voir dire* questions and stated:

> "From the very get go the problem, as I've indicated from the beginning,
>
> is the fact that your own witness, your own doctor has found Mr. Burnett fit.  So
>
> has the 10th Floor [FCS].  Both have found him fit.  So I don't see where insanity
>
> even enters into this because, yes, he may have been medically treated or treated
>
> as such, but no one has said -- and at the time of the occurrence or since then that
>
> he -- I mean, currently he is fit.  Nobody ever said he was insane at the time of the
>
> offense, and I'm not -- and this is what I have brought up repeatedly with [defense
>
> counsel] in regards to this because how is it that you present this defense if you
>
> don't have a witness to say that he was insane at the time of the offense or is
>
> currently legally insane?"

Defense counsel responded that Illinois law does not require a defendant to present expert opinion that he is insane in order to raise the insanity defense, citing *People v. Childs*, 51 Ill. 2d 247 (1972).  The State argued that that the defense did not submit the insanity defense early enough and moved *in limine* to bar Dr. Seltzberg from testifying as an expert witness for the defense.

¶ 24    The trial court ruled that defendant was precluded from raising the insanity defense, mentioning insanity or defendant's mental health during opening statement, and presenting Dr. Seltzberg as a defense expert on the issue of insanity. The court noted that Dr. Seltzberg never provided an opinion on defendant's sanity at the time of the offense.

¶ 25    After the State presented its case, defendant moved for a directed verdict, which the trial court denied. The court also denied defendant's motion to reconsider its pretrial ruling denying his request to have Dr. Seltzberg testify. Defendant submitted a written offer of proof of Dr. Seltzberg's proposed testimony. The offer of proof stated that Dr. Seltzberg would testify that she diagnosed defendant with schizophrenia, among other diagnoses. The offer of proof did not include any specific finding that defendant was insane at the time of the offense.

¶ 26    Defendant testified on his own behalf. He described his mental health history, including his hospitalizations and the medications that he was taking. On February 26, 2008, defendant was taking Risperdal for "[b]ipolar and it leads to dementia and schizophrenic." Defendant stated that "[t]hey got different kinds of Risperdal. Some of it tastes like Tylenol. Some of it tastes like candy, closer to candy." Defendant took two Risperdal pills on the date of the incident. Defendant was supposed to take three doses of Risperdal each day. He did not take his dosage of Risperdal later that day because he was in custody. He described what happened on the date of the incident.

¶ 27    On cross-examination, defendant testified that he occasionally used crack cocaine and that he used some with his boss on the date of the incident. He also used heroin, but was "not an experienced user." Defendant acknowledged that he took crack cocaine and heroin voluntarily while he took Risperdal. Defendant stated that he never saw anyone get out of the van before he jumped in. As he drove away, defendant heard knocking and twice heard someone say, "this is

my vehicle." Defendant kept driving the van out of the gas station because he "didn't know if the firearm was knocking or about to be like a situation with a firearm." Defendant repeatedly stated that he panicked when he saw someone trying to enter the van while he was driving and that he lost control of the van. He denied jerking the steering wheel and purposely swerving the van. He crashed the van into the wall and ran because he knew what he did was wrong and that the sheriffs would be coming.

¶ 28    Defendant stated that he never saw anyone with a gun while he drove on the expressway. Defendant agreed that he initially lied to police officers when he told them he was not driving the van at the time of the incident. He explained that he gave an alias to the police officers because "I had a name and everything because I was being disrespected from how you talk, that light supposed to be good. There is not supposed to be no darkness. I was being disrespected by the darkness." He told Special Agents Thien and Phillips that his name was Jamie Sampson because "I wasn't feeling like Herman Burnett," and that he thought the special agents "were going to fix the problem." Defendant initially told the special agents that he asked a group of men standing by a green van for a ride and they told him to get into the van. He told the special agents that he sat in the back seat behind the front passenger seat and that he paid $4 for the ride. Defendant acknowledged that he lied to the special agents about paying $4 for a ride. He explained that he was joking at that time.

¶ 29    The State also questioned defendant's statement to the special agents that he was "NGRI." Defendant stated that he told the special agents he was "NGRI" in response to their request to take a DNA sample. When the State asked whether defendant refused to give a DNA sample because it could be used as evidence against him, he responded, "I knew that God had

12

new [*sic*] already about the case." He then acknowledged that he knew his DNA could be used as evidence in his case and that he did not want that to happen.

¶ 30 On redirect examination, defendant stated that the special agents asked him whether he was insane. He told the special agents that "God knew that the case had -- was involved with, and I thought to tell them I was insane because that's how much I was insane, things was insane." He told the special agents about his mental health history and medications. When asked why he lied to the special agents, defendant responded, "I had to joke with them because things was too dark," to which he further explained, "[w]hen they say a little hell, hellafied, hell is dark. When you start leaving out of hell, you see light." Defendant did not worry about lying to the police because he knew that he "was going to get a chance to tell [his] story" and that he was not feeling well the first time he told his story. When asked to describe the bald spot on his head, defendant stated "[i]t's water on my brain" and that "[i]t scabs a lot."

¶ 31 Defendant rested after testifying. In rebuttal, the State presented three certified copies of defendant's felony convictions for possession of burglary tools, unlawful possession of a stolen motor vehicle, and retail theft. The defense again requested that it be allowed to call Dr. Seltzberg as an expert witness, which the trial court denied, stating "Dr. Seltzberg has rendered Mr. Burnett previously unfit but then fit and legally sane at the time of the incident, and I don't believe that her testimony in regards to the NGRI has any relevance or bearing on this."

¶ 32 Defendant also moved for mistrial because the State injected the question of insanity during his cross-examination by asking him what he thought "NGRI" meant. The State responded the issue of defendant's insanity was "fair game" because he filed a defense of insanity. The trial court denied defendant's motion, stating that both sides had ample opportunity to present their cases and that "[e]ven with the NGRI, it's a statement, such as the

statement is of darkness which was then went into as well. [T]he jury had an opportunity to see the direct and cross examine the -- testimony of Mr. Burnett and weigh the credibility." Additional discussion regarding Dr. Seltzberg's proposed testimony ensued and the court stated, "Well, that's as to the legal sanity at the time but both of those -- all three doctors indicate Mr. Burnett is fit. While Dr. Seltzberg indicated previously, her re-evaluation indicates he's fit, as well as Dr. Cooper and Dr. Echevarria."

¶ 33    The trial court allowed Dr. Cooper to testify in rebuttal. Dr. Cooper testified at length and over ongoing objections that defendant was sane at the time of the incident. Dr. Cooper based his findings, among other things, on defendant's post-arrest interrogation; namely, that defendant provided investigators with an alias, denied that he was the driver of the van, and provided a detailed, logical account of the incident. Defendant told Dr. Cooper that he did not have a history of significant mental illness or disease. According to Dr. Cooper, defendant's explanation of the incident did not suggest disorganized thinking, psychotic symptoms, or delusional ideation. Dr. Cooper also stated that defendant had both a cocaine and heroin dependence. Dr. Cooper acknowledged during cross-examination that mentally ill people commonly suffer from substance abuse.

¶ 34    At the jury instruction conference, defendant requested instructions on insanity, second-degree murder, self-defense, PSMV, and reckless homicide. The trial court denied each of these instructions. Defendant moved to strike all testimony regarding his drug use, arguing it was prejudicial considering the jury would not be instructed on insanity. The court denied the motion and the State rested in rebuttal. The defense also renewed its request to recall Dr. Seltzberg in surrebuttal and moved for directed verdict, which the court denied.

¶ 35    The jury found defendant guilty of first degree murder and vehicular hijacking. Defendant filed a motion for new trial, which the trial court denied. The trial court imposed consecutive sentences of 50 years for first degree murder and six years for vehicular hijacking. This appeal followed.

¶ 36                                ANALYSIS

¶ 37    Defendant argues on appeal that: (1) the State failed to prove him guilty of first degree murder and vehicular hijacking beyond a reasonable doubt; (2) the trial court deprived him of his right to present an insanity defense throughout the proceedings; (3) the trial court deprived him of a fair trial when it precluded jury instructions for second degree murder, self-defense, PSMV, and reckless homicide; (4) the trial court failed in its duty to *sua sponte* order further fitness examinations to determine whether he was fit for trial after making nonsensical statements in open court; and (5) the State's repeated references to his drug use deprived him of a fair trial. Although the second issue is dispositive of this case, we briefly address other issues as necessary.

¶ 38                         Sufficiency of the Evidence

¶ 39    Defendant first argues the evidence adduced at trial demonstrated that he was guilty of reckless homicide and not first degree murder and vehicular hijacking. Defendant premises his argument on the fact that he did not take the van from the person or immediate presence of Holmes; rather the taking of the vehicle was already in progress when Holmes jumped onto the van. Defendant used no force to take the vehicle. He simply got into the van and drove away, never having interacted with Holmes during the commission of the offense. Furthermore, defendant argues that the evidence did not establish an intentional or knowing mental state beyond a reasonable doubt for first degree murder and that his actions demonstrated

recklessness. Defendant argues his murder conviction should be reduced to reckless homicide and that he should be resentenced to reflect the conviction of the lesser offense.

¶ 40    When presented with a challenge to the sufficiency of the evidence, this court must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.)  *People v. De Filippo*, 235 Ill. 2d 377, 384-85 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  The testimony of a single witness, if positive and credible, is sufficient to convict.  *People v. Bannister*, 378 Ill. App. 3d 19, 39 (2007) (citing *People v. Smith,* 185 Ill. 2d 532, 541 (1999)), *aff'd*, 236 Ill. 2d 1 (2009).  In addition, we may not retry the defendant; instead, the trier of fact must assess the credibility of the witnesses, determine the appropriate weight of the testimony, and resolve conflicts or inconsistencies in the evidence.  *People v. Evans*, 209 Ill. 2d 194, 209, 211 (2004).  It is axiomatic that a jury is not required to accept any possible explanation compatible with a defendant's innocence and elevate it to the status of reasonable doubt.  *People v. Herrett*, 137 Ill. 2d 195, 206 (1990).  In essence, this court will not reverse a conviction unless the evidence is "so unreasonable, improbable or unsatisfactory that it raises a reasonable doubt of defendant's guilt." *Evans*, 209 Ill. 2d at 209.

¶ 41    Defendant challenges his conviction for vehicular hijacking, upon which his first degree murder conviction is premised.  "A person commits vehicular hijacking when he or she takes a motor vehicle from the person or the immediate presence of another by the use of force or by threatening the imminent use of force."  720 ILCS 5/18-3(a) (West 2008).

¶ 42    The holding in *People v. Phyfiher*, 361 Ill. App. 3d 881 (2005), which had similar facts, supports our conclusion that the State presented sufficient evidence to convict defendant under

the vehicular hijacking statute. The *Phyfiher* court found sufficient that the vehicular hijacking was "in progress" while the victim approached his vehicle and grabbed the passenger door handle. The fact that the victim attempted to reclaim his van after the defendant already began driving away was enough to complete the offense. *Phyfiher*, 361 Ill. App. 3d at 885. In this case, because defendant continued driving the van onto the Dan Ryan Expressway after the victim demanded he relinquish control, defendant engaged in an act of force which satisfied that element of vehicular hijacking. We thus find the evidence presented at trial was sufficient for the guilty findings of vehicular hijacking and first degree murder (based on the commission of a felony).

¶ 43                     Presentation of Insanity Defense

¶ 44    Defendant contends that he was denied a fair trial due to the trial court's errors regarding his attempt to present an insanity defense. Specifically, he argues that the trial court erred in denying (1) proposed jury instructions on the insanity defense; (2) his proposed *voir dire* questions as to bias surrounding mental illness and the insanity defense; (3) proffered testimony from his expert witness, which defendant asserts would have rebutted the State's rebuttal witness (Dr. Cooper), explained both defendant's statement to investigators that he was previously "NGRI" as well as his overall state of mind; and (4) his request to argue insanity in his opening statement. Defendant also asks that we reassign this case to a new trial judge on remand because of the trial judge's "hostility toward the insanity defense."

¶ 45                     Jury Instructions – Insanity Defense

¶ 46    Although the law presumes that all persons are sane, that presumption is rebutted when the issue of a defendant's sanity is clearly raised. *People v. Dwight*, 368 Ill. App. 3d 873, 879 (2006) (citing *People v. Childs*, 51 Ill. 2d 247, 256-58 (1972)), *appeal denied*, 223 Ill. 2d 646

17

(2007). In Illinois, a defendant is legally insane if at the time of the offense, he lacks the "substantial capacity to appreciate the criminality of his conduct" as a result of a mental disease or defect. 720 ILCS 5/6-2(a) (West 2010). Although a defendant must *prove* by clear and convincing evidence that he is not guilty by reason of insanity (720 ILCS 5/6-4 (West 2010)), insanity is an affirmative defense, which means that the defendant merely needs to present "some evidence" to properly *raise* it (720 ILCS 5/3-2(a) (West 2010)). The "some evidence" standard has been held to be "enough evidence *** that, if believed, *** would be sufficient for a reasonable jury to find in [the defendant's] favor." (Internal quotation marks removed; alteration in the original.) *Dwight*, 368 Ill. App. 3d at 879.

¶ 47　"Courts consider the standard of proof when deciding whether an insanity instruction must be given." *Id.* "An insanity instruction should be given where sufficient evidence has been presented to support a jury's finding of insanity by clear and convincing evidence." *People v. Buchanan*, 403 Ill. App. 3d 600, 604 (2010) (citing *Dwight*, 368 Ill. App. 3d at 879-81). "Neither psychiatric testimony nor medical or lay opinion is necessary to give the instructions if the evidence itself reveals serious mental defects or a substantial history of mental illness." *Dwight*, 368 Ill. App. 3d at 880. Rather, whether the instruction must be given turns on "whether a reasonable jury, hearing the testimony presented by the defense witnesses, could find by clear and convincing evidence that the defendant, due to his mental illness, lacked substantial capacity to appreciate the criminality of his conduct at the time of the crime." *Id.* at 881. The *Dwight* court further observed that a federal appellate court construing a "very similar" federal statute held that a trial judge must construe this evidence " 'most favorably to the defendant.' " *Id.* at 880 (quoting *United States v. Owens*, 854 F.2d 432, 436 (11th Cir. 1988)). The trial court's

decision as to whether to provide a jury instruction on insanity is subject to an abuse of discretion standard of review. *Id.*; *People v. McDonald*, 2016 IL 118882, ¶ 42.

¶ 48    In this case, the trial court made an error in law and thus abused its discretion in refusing to instruct the jury as to an insanity defense. At the outset, the trial court repeatedly stated that the question of defendant's sanity did not arise because defendant's expert witness, Dr. Seltzberg, found defendant fit to stand trial with medication but did not opine as to defendant's sanity at the time of the offense. This was error. First, it is a deeply-rooted rule that the questions of fitness for trial and sanity concern different time frames and different standards. See *People v. Nichols*, 70 Ill. App. 3d 748, 753-54 (1979) (holding that "the standards for competency to stand trial and sanity at the time of the offense are different and that a finding as to competency does not necessarily answer the question whether a defendant was sane at an earlier time") (citing *People v. Seawright*, 73 Ill. App. 2d 426, (1966) ("The two questions are not the same.")). In addition, the determination of sanity is not dependent upon *any* particular type of testimony, expert or otherwise. *Dwight*, 368 Ill. App. 3d at 880 ("Where there is sufficient evidence based on the testimony and observations of the witnesses to support the defense, the absence of opinion evidence is immaterial.") (citing *People v. Smothers*, 55 Ill. 2d 172, 175 (1973).

¶ 49    Moreover, the record in this case reveals sufficient evidence as to insanity that, if believed, would have resulted in the jury finding in defendant's favor. *Id.* at 879. We note that there was ample evidence that defendant had a mental illness at the time of the occurrence and the State does not dispute that; instead, the State disputes whether defendant was legally insane at that time. Defendant admitted on cross-examination that, while in custody shortly after the occurrence, he gave police investigators a false name because he "wasn't feeling like Herman

19

Burnett," and he further explained on redirect examination that, at that time, it did not feel like a police interview because it was "too dark" in the room. When trial counsel asked whether he would have given his actual name had the lights been on, defendant responded, "Light like the light that we heard when we were raised. Things are supposed to have light to it." Immediately afterward, the trial court sustained the State's objection. Trial counsel then asked what defendant meant by "dark," and defendant stated, "When they say a little hell, hellafied [*sic*], hell is dark. When you start leaving out of hell, you see light." Defendant's explanation to the police investigators of his bipolar disorder was that one part of "your important part comprehends the fullness of stuff," and the "fullness" defendant referred to was a "memory bank or something." Also on redirect examination, defendant confirmed that the bald spot on the back of his head was not a bald spot. Instead, it was "water" on his brain that "scabs a lot." In response to trial counsel's request, defendant stood up and turned to show the jury his head. Defendant further explained that he got this not from hitting his head on something, but from "just dealing with tattoos and stuff."

¶ 50    In addition, although defendant testified on cross-examination that he immediately fled the scene of the accident because he knew he did something "wrong," other testimony does not clarify whether defendant was referring to the damage to the van he believed he had rented or the victim's injuries. In fact, although defendant testified that he did look at the driver's side of the van after the accident, there is no testimony that he looked at or saw the victim. Moreover, Chicago police officer Mendez testified that he noticed defendant running alongside the highway and then struggled to get up the snowy embankment, eventually reaching the top and climbing over the fence onto 87th Street near the intersection of South State Street. Mendez then noted

that, rather than flee at the sight of Mendez and his two partners, defendant was merely "walking" toward them.

¶ 51    Finally, although the State's two expert witnesses opined that defendant was sane at the time of the offense and defendant's witness rendered no opinion, their reports all described multiple mental illnesses from which defendant suffered, including schizophrenia and psychotic disorder, and they further noted that defendant suffered from hallucinations, "disorganized thinking," and drug addiction.  In addition, one of the State's expert witnesses, Dr. Cooper, testified in rebuttal as to these facts.  An intelligence test also revealed that defendant's intelligence quotient (IQ) was 72, the third percentile, placing him within a "borderline range of cognitive functioning."

¶ 52    Overall, the facts of this case compel our holding that, as in *Dwight*, there was sufficient evidence to place defendant's sanity before the jury.  The jury would then have been able to specifically accept or reject defendant's insanity defense.  Accordingly, the trial court erred in failing to instruct the jury as to insanity, and the State failed to show that this error was harmless beyond a reasonable doubt[1] (see *People v. Fierer*, 124 Ill. 2d 176, 187 (1988) ("Constitutional errors, of course, must be shown to be harmless beyond a reasonable doubt") (citing *Chapman v. California*, 386 U.S. 18 (1967))).  We therefore remand this cause for a new trial.  Double jeopardy, however, will not bar retrial because all of the evidence submitted at the original trial, even that which was erroneously submitted, is sufficient to establish defendant's guilt. *People v. Olivera*, 164 Ill. 2d 382, 393 (1995).  Nonetheless, in making this finding with respect to defendant's guilt, "we reach no conclusion *** that would be binding on retrial." *People v. Naylor*, 229 Ill. 2d 584, 611 (2008).

---

[1]    We note that the State does not argue in its brief that the trial court's error was harmless beyond  a reasonable doubt.

¶ 53                          Other Issues

¶ 54    Since we have held that defendant has sufficiently raised the issue of insanity, on remand

he should be allowed to *voir dire* prospective jurors on this issue.  See, *e.g.*, *People v. Gregg*,

315 Ill. App. 3d 59, 65 (2000) (holding that, when a defendant's sanity is at issue, the parties

have a right to examine jurors concerning their attitudes on the insanity defense) (citing *People v.*

*Robinson*, 102 Ill. App. 3d 884 (1981)).  In addition, on remand defendant should be allowed to

submit evidence, including expert testimony, to support that defense.  *People v. Lerma*, 2016 IL

118496, ¶ 23 (holding that a defendant's right to due process and a fundamentally fair trial

includes the right to present witnesses on his or her own behalf).

¶ 55                     New Trial Judge on Remand

¶ 56    Finally, we reject defendant's request that we remand this cause for reassignment to a

different trial judge.  A trial judge is presumed to be impartial, and the burden of overcoming this

presumption rests on the party making the charge of prejudice. *Eychaner v. Gross*, 202 Ill. 2d

228, 280 (2002).  "To conclude that a judge is disqualified because of prejudice is not, of course,

a judgment to be lightly made."  *Id.* (quoting *People v. Vance*, 76 Ill. 2d 171, 179 (1979)).  A

trial judge's rulings alone are almost never a valid basis from which to claim judicial bias or

partiality, and this includes the judge's allegedly erroneous findings and rulings.  *Id.*  Instead, the

party claiming prejudice must present evidence of prejudicial trial conduct and evidence of the

judge's personal bias, which can stem from an extrajudicial source.  *Id.*

¶ 57    Here, defendant points to no extrajudicial source of the trial judge's alleged bias against

the insanity defense.  To the contrary, defendant solely points to the trial judge's erroneous

rulings with respect to his insanity defense.  In our view, those rulings did not originate from

some bias against the defendant.  They were simply errors of law, which cannot serve as a valid

basis to reassign this cause. *Cf. People v. Heider*, 231 Ill. 2d 1, 24-25 (2008) (remanding for resentencing before a new judge where the original trial judge concluded that the defendant's mental retardation rendered him a future danger, despite the fact that "the record does not support such a conclusion"). Defendant's request is therefore denied.

¶ 58                                          CONCLUSION

¶ 59     We reverse defendant's convictions for first degree murder and vehicular hijacking due to the trial court's failure to instruct the jury on the defense of insanity. Because the evidence is sufficient to support a finding of guilty, we remand this cause for a new trial, and allow defendant to *voir dire* the jury on the issue of insanity and to present evidence, including expert testimony, in support of his insanity defense.

¶ 60     Reversed and remanded.