# Illinois Official Reports

## Appellate Court

---

### *People v. Jamison*, 2018 IL App (1st) 160409

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ISMAAEEL JAMISON, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-16-0409 |
| Filed | December 28, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CR-22847; the Hon. Kenneth J. Wadas, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Manuela Hernandez, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Mary L. Boland, and Kathryn A. Schierl, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion. Justices Cunningham and Connors concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant-appellant, Ismaaeel Jamison, was arrested and convicted of three counts of aggravated battery. At trial, the State presented evidence that demonstrated defendant punched Hector Hernandez while he attempted to board a Chicago Transit Authority (CTA) bus. The evidence also showed that while on the bus, defendant made insulting or provoking contact with the bus driver, Thomas Hojnacki. After the jury convicted defendant, the trial court sentenced defendant to nine years' imprisonment.

¶ 2    Defendant timely appealed to this court. He raises several arguments before this court: (1) the State failed to prove he acted knowingly when he committed both aggravated batteries; (2) the State failed to prove he knew the victim, Thomas Hojnacki, was over 60 years old; (3) trial counsel provided ineffective assistance when he promised testimony from two witnesses but never called them during the trial; (4) the trial court violated Illinois Supreme Court Rule 431(b) (eff. July 1, 2012); and (5) he established a *prima facie Batson* claim so this case should be remanded for a second and third stage *Batson* proceeding. See *Batson v. Kentucky*, 476 U.S. 79 (1986).

¶ 3    After reviewing the record and for reasons stated more fully below, we affirm the defendant's convictions for aggravated battery. The State presented sufficient evidence from which the jury could infer defendant acted knowingly when he committed the batteries. Trial counsel did not provide ineffective assistance for failing to call two witnesses mentioned in opening statements. The evidence was not closely balanced so defendant is not entitled to remand on the Rule 431(b) violation nor is he entitled to remand for the alleged *Batson* violation.

¶ 4                                JURISDICTION

¶ 5    On September 4, 2015, a jury found defendant guilty of three counts of aggravated battery and not guilty on two other counts of aggravated battery. Defendant filed a motion for a new trial, which the court denied on October 2, 2015. On December 11, 2015, the trial court sentenced defendant to nine years' concurrent imprisonment on the two aggravated batteries. A notice of appeal was filed December 29, 2015. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution and Illinois Supreme Court Rules 603 and 606, governing appeals from a final judgment of conviction in a criminal case entered below. Ill. Const. 1970, art. VI, § 6; Ill. S. Ct. Rs. 603, 606 (eff. Feb. 6, 2013).

¶ 6                                BACKGROUND

¶ 7    The State charged defendant with six counts of aggravated battery for his conduct on a CTA bus on November 22, 2012. The State proceeded to trial on five of the six counts: aggravated battery causing bodily harm to transit passenger Hector Hernandez (count II), aggravated battery causing bodily harm to transit employee Thomas Hojnacki (count III), aggravated battery caused by contact of an insulting or provoking nature with transit employee Thomas Hojnacki (count IV), aggravated battery causing bodily harm to an individual (Thomas Hojnacki) 60 years or older (count V), and aggravated battery caused by contact of an insulting or provoking nature to a victim (Thomas Hojnacki) 60 years or older (count VI).

¶ 8    Prior to the start of trial, defense counsel moved for a behavioral clinical examination of defendant "for physical incapacity to assist the defense" based on a claim defendant had no recollection of the events leading to his arrest. On November 2, 2014, the court held a fitness hearing in which forensic psychologist, Dr. Christopher Cooper, chief of psychology and clinic coordinator for Forensic Clinical Services, testified regarding the interview he conducted with defendant on August 22 and August 29, 2014.

¶ 9    Dr. Cooper testified that he examined defendant and found no signs of acute psychological symptoms. During the examination, defendant indicated he understood the relevant aspects of his prosecution and the roles of all the various court personnel. Defendant informed Dr. Cooper that he had no memory of the incident that led to his arrest. Based on defendant's claim, Dr. Cooper administered two memory malingering tests to objectively assess cognitive malingering or memory impairment. Defendant's scores on both tests were "highly indicative of malingering current memory dysfunction or currently a malingering memory impairment." Dr. Cooper opined that defendant was fit to stand trial and assist in his own defense. After hearing from Dr. Cooper, the trial court found defendant fit to stand trial.

¶ 10    Jury selection began on September 1, 2015. During *voir dire*, defense counsel raised two *Batson* objections alleging the State improperly dismissed African-American venirepersons based solely on their race. Of the four peremptory strikes utilized by the State, three were used against African-Americans. After hearing from defense counsel, the trial court (on both motions) concluded defendant failed to establish a *prima facie* case of systematic exclusion because the State had accepted other African-Americans to sit on the jury.

¶ 11    During opening statements, defense counsel argued defendant committed the acts attributed to him but was not guilty because he had not committed the acts "knowingly." Defense counsel informed the jury that defendant's girlfriend would testify and describe to them defendant's actions and demeanor prior to the events on the bus. He also told the jury that Officer Glenn Manguerra, the first responding officer who shot defendant twice, would relay to the jury the appropriate procedure that should have been followed that day. Defense counsel went on to suggest that Officer Manguerra did not follow proper police procedures and the case against defendant was an attempt to justify the officer's misdeeds.

¶ 12    Hojnacki testified that on November 22, 2012, he was 67 years old and working as a CTA bus driver. His route that day was on California Avenue from 71st Street up to the north side of the city. While driving the bus, he wore his CTA issued shirt, tie, and coat. The bus only had one passenger when defendant boarded at either 68th Street or 67th Street and California Avenue. Upon entering the bus, defendant wore a winter coat and cap and did not display any unusual behavior. Almost immediately, defendant began arguing with the other passenger on the bus. Hojnacki stopped the bus at 65th Street, and the other individual exited while defendant remained on the bus. Another black male boarded the bus at this time. Hojnacki immediately heard defendant and the new passenger arguing, and when he turned around, the men were punching each other. Hojnacki hit the panic button and pulled over at 63rd Street. After pulling over, he hit the panic button again and dialed 911. Defendant and the other man continued to fight even after Hojnacki yelled at them to leave and that the police were on the way.

¶ 13    While stopped, defendant moved toward the front of the bus and without warning punched a Hispanic man, Hernandez, attempting to enter. Defendant hit the man with a closed fist, causing the man's head to hit a metal bar inside the bus. Hernandez exited the bus, and

defendant again confronted the black man at the back of the bus. This man then ran out the back door. Hojnacki was still seated in the driver's seat when defendant came back to the front of the bus. Defendant exited through the front door, grabbed a teenage girl from the sidewalk, and dragged her back onto the bus. The girl's mother followed defendant screaming and hitting him.

¶ 14    Hernandez, who had fled to a nearby currency exchange, observed the situation and went back to the bus to lend assistance. Hernandez approached defendant, who punched him in the face again. Despite the punch, Hernandez was able to get the defendant's attention long enough for the teenage girl to escape off the bus. Hernandez also exited the bus and returned to the currency exchange until the police arrived.

¶ 15    Defendant remained on the bus and proceeded to remove both his coat and shirt. He yelled at Hojnacki, "this is my m*** bus" and ordered him to drive. Hojnacki told defendant the bus had broken down and he had called for help. Defendant then grabbed Hojnacki by the sleeve of the shirt. Hojnacki told defendant "[Y]ou don't want to fight me, I'm just an old man." Defendant then released Hojnacki from his grip.

¶ 16    Officer Manguerra of the Chicago police was the first officer to arrive on the scene. He had been flagged down by a bystander, Ana Torres, and was alone in his car. Defendant exited the bus to confront the officer. Hojnacki remained on the bus but could see the pair and heard the officer tell defendant to "take it easy." Officer Manguerra drew his weapon as defendant walked toward him and then away. Defendant returned to the bus several times in an attempt to retrieve his shirt and coat, but Hojnacki would not open the door. Defendant again approached Officer Manguerra "as if he wanted to tackle" the officer. Officer Manguerra responded by shooting the defendant twice. Defendant fell to the ground. He attempted to stand back up but was tased by other officers at the scene.

¶ 17    Several other witnesses also testified as to what they observed that day. Hernandez explained that he was on his phone as he attempted to enter the bus and had not even paid his fare before defendant punched him in the face. When he saw defendant grab the teenage girl, Hernandez intervened, and defendant punched him again. He described defendant as very aggressive and looking for a fight. Torres was at the corner of 63rd Street and California Avenue when the incident occurred. She observed defendant being aggressive and threatening people. While she called 911, she also flagged down a passing patrol car. She saw the initial confrontation between the officer and defendant but ran inside when she heard gunshots. Even after the shooting, defendant continued to be aggressive toward the police and fire personnel.

¶ 18    Chicago Fire Department Lieutenant John Knightly responded to a call of a battery victim aboard a CTA bus. When he arrived, he observed a Chicago police officer confronting a shirtless black man, who he identified as defendant. Defendant had an "extremely aggressive" demeanor and Lieutenant Knightly called for additional assistance. Lieutenant Knightly saw defendant make aggressive movements toward the officer who continued to order defendant to the ground. After defendant was unable to reboard the bus, he lowered himself into a "football stance" and charged both him and the officer. The officer responded by firing two shots. Even after being shot, defendant continued to crawl toward them. It took several officers and a taser to subdue defendant.

¶ 19    Chicago Fire Department engineer John Haran provided similar testimony to Lieutenant Knightly. After arriving at the scene, he observed defendant shirtless and in a rage. Defendant was ranting and raving with his fists clenched. Defendant ignored the officers' commands

- 4 -

while making several advances in their direction. Haran witnessed defendant get into the "football stance" and charge the officers before being shot.

¶ 20 Chicago police officer Denis Solner and Officer Lule[1] also testified as to their observations. Officer Solner testified that witnesses described defendant's actions as "crazy." Officer Lule arrested defendant, and he testified that during the arrest, defendant turned to him and said, "[N]ow, shoot me."

¶ 21 Two videos of the incident were admitted into evidence. The first video depicted the inside of the CTA bus and shows that part of the incident. The second video came from a camera belonging to a nearby currency exchange that captured the police shooting defendant. It also depicts defendant attempting to get back up after being shot and the police utilizing a taser against defendant. Both videos show defendant's actions as well as his physical demeanor throughout the event.[2]

¶ 22 Following closing arguments, the jury found defendant guilty on count II (aggravated battery causing bodily harm to a transit passenger), count IV (aggravated battery based on insulting or provoking contact against a transit employee), and count VI (aggravated battery based on insulting or provoking contact against an individual 60 years or older). Defendant was acquitted of counts III (aggravated battery causing bodily harm to a transit employee) and count V (aggravated battery causing bodily harm to a person 60 years or older). The trial court merged count VI into count IV and then sentenced defendant to nine years on both counts II and IV to run concurrently.

¶ 23 This timely appeal follows.

¶ 24                                  ANALYSIS

¶ 25 Before this court, defendant raises two sufficiency of the evidence arguments. Defendant argues the State failed to present sufficient evidence from which the jury could infer that he acted knowingly when he committed the aggravated batteries against Hojnacki and Hernandez. Additionally, defendant argues the State failed to present sufficient evidence to demonstrate that he knew Hojnacki was 60 years or older. We analyze each argument in turn.

¶ 26 When a defendant argues the evidence was insufficient to sustain his conviction, the inquiry is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *People v. Collins*, 214 Ill. 2d 206, 217 (2005). In reviewing the sufficiency of the evidence, the appellate court will not retry the defendant. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). It is the trier of fact's function to assess witness credibility, weigh and resolve conflicts in the evidence, and draw reasonable inferences from the evidence. *People v. Williams*, 193 Ill. 2d 306, 338 (2000). While the trier of fact's findings regarding witness credibility are entitled to great weight, the determination is not conclusive. *Smith*, 185 Ill. 2d at 542. The fact finder's acceptance of testimony as true does not guarantee that it was reasonable to do so. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). However, an appellate court will only reverse a

---

[1]The record does not disclose Officer Lule's first name.

[2]While the record contains a DVD purporting to contain the videos, defendant's brief indicates appellate counsel could not get the video to play. This court was also unable to view the video.

conviction where no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Smith*, 185 Ill. 2d at 541.

¶ 27     In his first sufficiency argument, defendant contends the State failed to prove he knowingly caused bodily harm to Hernandez or that he knowingly made physical contact of an insulting or provoking nature with Hojnacki. The aggravated battery statute requires the actions be committed "knowingly." See 720 ILCS 5/12-3.05 (West 2016) (requiring a person to knowingly commit one of the prohibited actions). The Criminal Code of 2012 further states,

"A person knows, or acts knowingly or with knowledge of:

(a) The nature or attendant circumstances of his or her conduct, described by the statute defining the offense, when he or she is consciously aware that his or her conduct is of that nature or that those circumstances exist. Knowledge of a material fact includes awareness of the substantial probability that the fact exists.

(b) The result of his or her conduct, described by the statute defining the offense, when he or she is consciously aware that that result is practically certain to be caused by his conduct." *Id.* § 4-5.

Since "knowingness" is a state of mind, it will rarely be proven by direct evidence. Rather, the State will often have to prove "knowingness" based on the surrounding circumstances of the event, "including the character of the assault and the nature and seriousness of the injury." *People v. Williams*, 165 Ill. 2d 51, 64 (1995).

¶ 28     After reviewing the evidence in a light most favorable to the State, a rational trier of fact could reasonably conclude that defendant acted knowingly when he punched Hernandez and grabbed Hojnacki while he sat in the driver seat of the bus.

¶ 29     Defendant argues that the evidence presented by the State demonstrates he was not acting "normally" and therefore his actions were not done knowingly. He further argues the videos show he was in a "strange rage" and that he was picking fights with random people. He removed his jacket and shirt for no reason. Bystanders saw him pacing back and forth, arms extended with clenched fists. Lieutenant Knightly testified that by the time he responded, defendant was "mumbling" or "uttering words I could not understand." Before being shot, defendant apparently got into a "football tackling position" when confronting the police officers. Even after being shot, defendant was combative and resisted first aid attempts.

¶ 30     While the above facts were presented as evidence, the jury concluded that despite the strange conduct, defendant's actions toward Hernandez and Hojnacki were done knowingly. The evidence demonstrated that defendant confronted Hernandez as he tried to enter the CTA bus. Defendant, without provocation or warning, then punched Hernandez in the face before Hernandez had an opportunity to pay his fare. The punch caused Hernandez to bleed, and Hernandez would eventually receive medical treatment for his injuries. After the incident with the teenage girl, defendant yelled at Hojnacki to keep driving. When Hojnacki responded that the bus was inoperable, defendant confronted Hojnacki and grabbed him. When Hojnacki implored defendant to not hit an old man, defendant released him. Despite the bizarre nature of defendant's actions on November 22, the jury concluded the actions against Hernandez and Hojnacki were undertaken knowingly.

¶ 31     Defendant's argument is based on reweighing the evidence and viewing it based on his interpretation, an action reviewing courts should not take. *People v. Collins*, 106 Ill. 2d 237, 261-62 (1985). It is well settled that appellate courts should not retry a defendant. *Smith*, 185

Ill. 2d at 541. It is the trier of fact's function to assess witness credibility, weigh and resolve conflicts in the evidence, and draw reasonable inferences from the evidence. *Williams*, 193 Ill. 2d at 338. In this case, the jury heard all of the testimony concerning defendant's strange behavior and viewed the corresponding video evidence. The jury ultimately concluded that the actions taken against Hernandez and Hojnacki were done knowingly. The evidence supports the jury's verdicts, and we decline to reverse it based on defendant's view of the evidence.

¶ 32    In affirming the aggravated battery convictions, we find defendant's reliance on *People v. Jackson*, 2017 IL App (1st) 142879, misplaced. In *Jackson*, another division of this court reversed a defendant's convictions for battery and resisting a peace officer. *Id.* ¶ 31. In *Jackson*, the responding paramedics characterized the conduct that led to the criminal charges as "defensive" in nature and not "violent." *Id.* ¶ 13. Unlike the actions of the defendant in *Jackson*, the defendant in this case was at all times the aggressor and his actions were violent. Moreover, we agree with Justice Mason's dissent in *Jackson* that "irrational behavior does not necessarily indicate that [defendant] was not consciously aware of the results of his actions." *Id.* ¶ 87 (Mason, J., dissenting). The evidence presented, taken in a light most favorable to the State, allows for a rational finder of fact to conclude defendant acted knowingly when he punched Hernandez and grabbed Hojnacki.

¶ 33    In his second sufficiency argument, defendant argues we should reverse his conviction under count VI because the State failed to prove he knew Hojnacki was 60 or older at the time of the offense. The State responds that this court lacks jurisdiction to consider the merits of defendant's conviction under count VI because it was merged into count IV and no sentence was imposed on it. Citing *In re T.G.*, 285 Ill. App. 3d 838, 845 (1996), and *People v. Burrage*, 269 Ill. App. 3d 67, 77 (1994), defendant replies that this court may consider the merits of a merged conviction when the case is properly on appeal from a final judgment on another offense.

¶ 34    After reviewing the relevant case law, we agree with the State that we lack jurisdiction to consider defendant's unsentenced conviction under count VI. Defendant's cited cases rely on *People v. Dixon*, 91 Ill. 2d 346 (1982). See *In re T.G.*, 285 Ill. App. 3d 838, 846 (1996) (citing *Dixon*, 91 Ill. 2d at 353-54); *Burrage*, 269 Ill. App. 3d at 72 (citing *People v. Frantz*, 150 Ill. App. 3d 296, 300 (1986), which relied on *Dixon*). However, *Dixon*'s scope has been narrowed by *People v. Relerford*, 2017 IL 121094.

¶ 35    As background, in *Dixon*, the defendant was convicted of armed violence, aggravated battery, mob action, and disorderly conduct. 91 Ill. 2d at 349. The trial court imposed sentences on the armed violence and aggravated battery convictions but did not impose a sentence on the mob violence and disorderly conduct convictions, holding that they merged into the other two offenses. *Id.* The appellate court reversed the defendant's armed violence conviction, and the State urged a remand to impose a sentence on either the mob action or disorderly conduct conviction. *Id.* at 351. The supreme court ultimately found that the appeal was properly before the appellate court with regard to the convictions for armed violence and aggravated battery and the failure to impose sentences on the unappealed convictions (for mob violence and disorderly conduct) had been "intimately related to and 'dependent upon' the appealed convictions within the meaning of Rule 615(b)(2)," so the appellate court could remand the case to impose a sentence. *Id.* at 353-54. The court noted that the situation was "an anomalous one," in that the trial judge's failure to impose a sentence for mob violence and disorderly

conduct stemmed from an erroneous belief that they merged into the other two offenses upon which he did impose sentences. *Id.* at 353.

¶ 36 In *Relerford*, 2017 IL 121094, ¶ 75, our supreme court stated *Dixon* had been applied too broadly. There, the appellate court had found that it had jurisdiction to address the validity of the defendant's unsentenced convictions based on *Dixon*. *Id.* ¶ 71. Our supreme court disagreed, explaining that to the extent "the appellate court had any jurisdiction to address the nonfinal convictions, that jurisdiction was limited to ordering remand for imposition of sentences on the lesser convictions." *Id.* ¶ 75. The court further stated that "*Dixon* must be understood to be limited to the type of factual situation presented in that case," where the circuit court incorrectly determined that lesser offenses had merged into the other offenses. *Id.* ¶ 74.

¶ 37 Here, this matter does not present a factual scenario akin to *Dixon*, and even if it did, all we could do is remand to impose a sentence on the lesser conviction. *Id.* ¶ 75. In accordance with *Relerford*, we lack jurisdiction to review the merits of defendant's unsentenced conviction under count VI.

¶ 38 In his next issue, defendant contends his trial counsel was ineffective for promising certain testimony during his opening statement but never presenting it at trial. During opening statements, defense counsel stated that defendant's girlfriend would testify as to defendant's activities prior to the incident in order to demonstrate that defendant had been behaving normally. Also during opening statements, defense counsel stated the first officer to encounter defendant, Officer Manguerra, mishandled the situation and the ensuing prosecution was an effort to justify the improper police response. Defense counsel never called defendant's girlfriend or Officer Manguerra.

¶ 39 Claims of ineffective assistance of counsel are judged under the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 685-87 (1984). In order to succeed on a *Strickland* claim, a defendant must demonstrate that (1) counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the trial would have been different. *Id.* at 687. Under the first prong, the defendant must show that under the circumstances, counsel's actions or inaction could not be considered "sound trial strategy." (Internal quotation marks omitted.) *People v. Rogers*, 172 Ill. App. 3d 471, 479 (1988). Trial counsel's conduct must have so undermined "the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. In certain circumstances, the failure to present promised evidence from an opening statement can qualify as ineffective assistance of counsel. *People v. Ortiz*, 224 Ill. App. 3d 1065, 1073 (1992).

¶ 40 Under the second prong, a defendant establishes prejudice by showing "but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different." *People v. Houston*, 229 Ill. 2d 1, 4 (2008). The reasonableness of counsel's actions must be determined in light of the totality of the circumstances. *People v. Atkins*, 161 Ill. App. 3d 600, 608 (1987). A defendant's failure to establish either prong precludes a finding of ineffective assistance. *People v. Patterson*, 217 Ill. 2d 407, 438 (2005). If a defendant cannot establish the prejudice prong, then a reviewing court does not need to engage in an analysis of the performance prong. *Strickland*, 466 U.S. at 697. Whether trial counsel's actions support a claim of ineffective assistance represents a question of law that this court reviews *de novo*. *People v. Max*, 2012 IL App (3d) 110385, ¶ 64.

¶ 41    Defendant's contention at trial was he did not act "knowingly" when he punched Hernandez and grabbed the shirt of Hojnacki. He argues the girlfriend's testimony would show he "was just a regular person on that day," "that he wasn't angry at anybody," "wasn't drunk," and "wasn't taking illegal or legal drugs." Based on the failure to present this testimony, defendant contends his trial counsel "could not substantiate that [defendant] was having a perfectly normal day and his behavior was some type of mental breakdown rather than a possible response to an earlier event." Defendant's argument regarding a possible mental breakdown is pure speculation. See *People v. Olinger*, 176 Ill. 2d 326, 363 (1997) (stating that pure speculation is insufficient to establish prejudice under *Strickland*). Defendant never contended he was suffering from mental illness. Neither at trial nor before this court does defendant identify the "type of mental breakdown" he allegedly suffered. Defendant also never requested the jury be instructed regarding a verdict of guilty but mentally ill. See Illinois Pattern Jury Instructions, Criminal, No. 24-25.01I (4th ed. 2000). Defendant never argued he suffered from a mental breakdown and the failure to call the girlfriend to testify on an issue never argued did not result in prejudice.

¶ 42    We also conclude the failure to call Officer Manguerra did not prejudice defendant. Whether or not Officer Manguerra followed proper police protocol upon confronting defendant after defendant had already committed the crimes has no bearing on whether defendant committed those crimes "knowingly." Moreover, defendant does not explain how any alleged improper conduct by Officer Manguerra means he did not knowingly punch Hernandez or grab Hojnacki. Finally, we reject this argument because it implies, without any evidence, the state's attorney's office is colluding with the police to cover up police misconduct. Based on the above, defendant's ineffective assistance of counsel claim fails because he cannot establish the failure to call either witness resulted in prejudice pursuant to *Strickland*.

¶ 43    In his next issue, defendant argues he is entitled to a new trial because the trial court violated Rule 431(b) when it failed to ask potential jurors whether they understood each of the principals contained in the rule. See Ill. S. Ct. R. 431(b) (eff. July 1, 2012) (listing the four principles a trial judge must ask jurors if they understand and accept). Defendant acknowledges he failed to object to the trial court's error and asks us to review the issue under the first prong of the plain error doctrine. The State concedes that the trial court committed a "clear and obvious error" under the first prong but argues the evidence was not closely balanced. See *People v. Herron*, 215 Ill. 2d 167, 187 (2005) (concluding that under the first prong of a plain error analysis a party must show both that an error occurred and the evidence was closely balanced so that the error alone threatened to tip the scales of justice). The State's position is that an error did occur, but defendant is not entitled to a new trial because the evidence of defendant's guilt was overwhelming. Given the State's concession, we confine our analysis to whether the evidence was closely balanced.

¶ 44    When deciding if the evidence presented at trial is closely balanced, "a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53 (citing *People v. Belknap*, 2014 IL 117094, ¶¶ 52-53). In making this determination, the court must assess the evidence presented at trial against the elements of the charged offense, along with any evidence concerning a witnesses' credibility. *Id.* "Whether the evidence is closely balanced is, of course, a separate question from whether the evidence is sufficient to sustain a conviction on

review against a reasonable doubt challenge." *People v. Piatkowski*, 225 Ill. 2d 551, 566 (2007).

¶ 45    As discussed *supra*, the only element defendant contested at trial was whether he acted knowingly when he punched Hernandez and grabbed the shirt of Hojnacki. In arguing the evidence is closely balanced, defendant again points to the testimony of witnesses who described his actions as not "normal" and "crazy." He points to the testimony of Lieutenant Knightly, who described defendant as out of control and unable to comprehend the officer's commands because defendant "was in such a rage."

¶ 46    We disagree with the defendant that the evidence at trial was closely balanced. Defendant does not argue that his conduct was the result of some involuntary action over which he had no control. Instead, defendant points to witness testimony and asks this court to infer he must have been suffering from some unknown mental breakdown, which meant his actions were committed in an unknowing fashion. Acting abnormally or "being in a rage" does not lead to the conclusion defendant was incapable of acting knowingly. Equally true, the witnesses' description of defendant's actions as "crazy" does not mean defendant suffered a mental breakdown.

¶ 47    Defendant never raised an insanity affirmative defense or requested a jury instruction on the issue. See *People v. Burnett*, 2016 IL App (1st) 141033, ¶ 46. Defendant never presented any evidence regarding a possible mental breakdown, and this court will not engage in speculation on the matter. See *People v. Givens*, 237 Ill. 2d 311, 323 (2010) (" 'a reviewing court should not normally search the record for unargued and unbriefed reasons to *reverse* a trial court judgment' " (emphasis in original) (quoting *Saldana v. Wirtz Cartage Co.*, 74 Ill. 2d 379, 386 (1978))). The evidence established that defendant confronted Hernandez and punched him in the face. Later, defendant grabbed Hojnacki when he refused to drive the bus.

¶ 48    Defendant has failed to meet his burden demonstrating the evidence was closely balanced. *People v. Nitz*, 219 Ill. 2d 400, 419 (2006). Consequently, defendant is not entitled to a new trial. See *Piatkowski*, 225 Ill. 2d at 568 (no new trial under the first prong of plain error if the evidence is not closely balanced).

¶ 49    In his last issue, defendant argues he made a *prima facie* showing of discrimination based on the State's use of peremptory challenges against African-American venirepersons. Defendant insists we should remand this proceeding for a second and third stage *Batson* hearing.

¶ 50    *Batson* represents a seminal case in federal constitutional jurisprudence. In *Batson*, the Supreme Court reaffirmed the principle "that the State denies a black defendant equal protection of the laws when it put him on trial before a jury from which members of his race have been purposefully excluded." *Batson*, 476 U.S. at 85. *Batson* establishes "a three-step process for evaluating alleged discrimination in jury selection." *People v. Rivera*, 221 Ill. 2d 481, 500 (2006). First, the objecting party is required to establish a *prima facie* case of purposeful discrimination "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. at 94 (citing *Washington v. Davis*, 426 U.S. 229, 239-42 (1976)). If a *prima facie* case is established by the objecting party, the burden shifts to the challenged party to proffer a nondiscriminatory, "neutral" explanation. *Id.* at 97-98. In the third stage, the trial court considers the reason provided by the challenged party for the venirepersons removal. *Rivera*, 221 Ill. 2d at 500. The objecting party is free to argue

that the proffered reasons are pretextual. *Id.* The trial court makes the final determination as to whether discrimination has been established. *Batson*, 476 U.S. at 98.

¶ 51    In *Johnson v. California*, 545 U.S. 162, 170 (2005), the Supreme Court explained the threshold for establishing a *prima facie Batson* claim is not high: "a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." Case law has provided seven factors to aid in determining whether a *prima facie* case exists:

> "(1) racial identity between the defendant and the excluded venirepersons; (2) a pattern of strikes against African-American venirepersons; (3) a disproportionate use of peremptory challenges against African-American venirepersons; (4) the level of African-American representation in the venire as compared to the jury; (5) the prosecutor's questions and statements during *voir dire* examination and while exercising peremptory challenges; (6) whether the excluded [black] venirepersons were a heterogeneous group sharing race as their only common characteristics; and (7) the race of the defendant, victim, and witnesses." *People v. Williams*, 173 Ill. 2d 48, 71 (1996).

See also *Rivera*, 221 Ill. 2d at 501. Our supreme court has also held comparative juror analysis from the *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005), decision may be utilized "in determining whether a *prima facie* case exists in the first instance." *People v. Davis*, 231 Ill. 2d 349, 361-62 (2008).[3] A trial judge's determination of whether a defendant has demonstrated a *prima facie* case of discriminatory jury selection will not be overturned unless it is against the manifest weight of evidence. *People v. Heard*, 187 Ill. 2d 36, 54 (1999); *People v. Hudson*, 157 Ill. 2d 401, 426 (1993).

¶ 52    During *voir dire,* the defendant's attorney raised a *Batson* objection at two different points and both times the trial court found that defendant had failed to establish a *prima facie* case of discrimination. The State used its first peremptory strike against Devenda Beals, an African-American venireperson, but defense counsel did not immediately object. The State then used its second peremptory strike against William Rody, but the record does not disclose Rody's race. Immediately after dismissing Rody, the State used its third peremptory challenge against Robert Jones, an African-American. This did draw a *Batson* objection from defense counsel. The following exchange then occurred:

> "[DEFENSE ATTORNEY]: Can we approach?
>
> [SECOND DEFENSE ATTORNEY]: May we approach, Judge, for a second.
>
> THE COURT: With the court reporter.
>
> [STATE'S ATTORNEY]: We need you.
>
> [SECOND DEFENSE ATTORNEY]: No. One we have an obligation—we— previous to this there is a Batson obligation because Ms. Beals was also excused and my client is black. Ms. Beals is black, Ms. [sic] Jones is black so we'd ask the Court, was race a reason they have for excluding?

---

[3]A comparative jury analysis looks at "a prosecutor's proffered reason for striking a black panelist" to determine if it "applies just as well to an otherwise-similar nonblack who is permitted to serve." *Miller-El*, 545 U.S. at 241. Comparative jury analysis cannot be used here because the State never proffered a reason for striking any of the African-American venirepersons.

[STATE'S ATTORNEY]: I don't believe the Defense has made a *prima facie* showing that there was any type of bias or any real reason for the excuse.

THE COURT: Have any African[-]Americans been accepted on the jury?

[STATE'S ATTORNEY]: Yes, they have. I believe that Ms. Annette Brown, the juror number two, was accepted by the State.[4]

THE COURT: All right. Okay. The Defense has [not] established a *prima facie* showing of a systematic exclusion of African[-]Americans at this point in time, and accordingly to [sic] the Motion for Batson relief is denied."

*Voir dire* then continued and the second panel of four venirepersons was seated as jurors without issue. During *voir dire* for the final group of four jurors, the State exercised a peremptory challenge against Stacey Anaman, an African-American venireperson. This drew an immediate objection from defense counsel. The following exchange then occurred:

"[DEFENSE ATTORNEY]: Your Honor, we have an objection if we can go in the back.

THE COURT: All right. Come to the back, court reporter. Defense objection.

[DEFENSE ATTORNEY]: It's the same objection Batson.

THE COURT: Renewing the Batson Motion, prosecution, the State is using a peremptory challenge on Ms. Anaman.

[STATE'S ATTORNEY]: I don't believe that this challenge was based on the basis of race.

THE COURT: Within this panel of four right now as far as—is the State accepting another African[-]American juror or excusing one so once again I don't think the Defense has established a *prima facie* showing of systematic exclusion in light of the fact that they're accepting multiple African[-]Americans so the Defense Motion for Batson relief is denied."

After this second *Batson* objection, the parties completed the final panel of four venirepersons and also seated the two alternates.

¶ 53    After reviewing the record and relevant case law, we cannot say that the trial court's determinations to deny the *Batson* challenges were against the manifest weight of the evidence. As the transcript demonstrates, when defense counsel raised both *Batson* objections, she only pointed to the fact that the venirepersons were African-Americans and defendant was African-American. This was insufficient under our case law.

¶ 54    Our supreme court has repeatedly cautioned, "the mere fact of a peremptory challenge of a black venireperson who is the same race as defendant or the mere number of black venirepersons peremptorily challenged, *without more* will not establish a *prima facie* case of discrimination." (Emphasis added.) *Davis*, 231 Ill. 2d at 360-61 (citing *Heard*, 187 Ill. 2d at 56). While defendant established that he and the excluded venirepersons were from the same cognizable racial group, he failed to raise the " 'other relevant circumstances' " from which a trial court could find a *prima facie* showing of discrimination. *Johnson*, 545 U.S. at 169 (quoting *Batson*, 476 U.S. at 96). It was defendant's burden to produce evidence from which the trial court could draw an inference of discrimination, and he failed to do so here. See *id.* at

---

[4]The record demonstrates that Annette D. Brown, an African-American, was part of the first panel of four venirepersons accepted to be part of the jury.

170 (noting that defendant satisfies the first requirement by producing sufficient evidence). Defendant argues the trial court failed to conduct a proper analysis but ignores that it was his burden to present the court with correct information in the first place.[5]

¶ 55    Defendant's attempt to engage in a first step analysis before this court is unavailing. Defendant argues that several factors counsel in favor of finding a *prima facie* case of discrimination including the fact that defendant is African-American, three challenged venirepersons were African-American, three of the four peremptory challenges made by the State were against African-Americans, and the three excluded African-American venirepersons were a heterogeneous group sharing race as their only common characteristic. Defendant engages in an incomplete analysis because the above represent only part of the relevant factors a court should look at to determine whether a *prima facie* case has been established. *Williams*, 173 Ill. 2d at 71.

¶ 56    Several other facts that are germane to a first stage *Batson* inquiry are not present in the record. The record does not demonstrate the level of African-American representation on the venire as compared to the jury nor does the record include the race of the victims or witnesses.[6] The Illinois Supreme Court has held the "unchallenged presence of jurors of that race on the seated jury is a factor properly considered [citations] and tends to weaken the basis for a *prima facie* case of discrimination." *Rivera*, 221 Ill. 2d at 513. Moreover, "racial characteristics of a crime are important factors to be considered in determining whether a *prima facie* case has been established." *People v. Andrews*, 146 Ill. 2d 413, 433 (1992) (citing *People v. Evans*, 125 Ill. 2d 50, 66 (1988)). Defendant has the responsibility for "preserving the record and any ambiguities in the record will be construed against [defendant]." *Davis*, 231 Ill. 2d at 365 (citing *Rivera*, 221 Ill. 2d at 512). We will not speculate as to the race of witnesses, victims, the venire panel, or members of the jury. Defendant's failure to preserve a complete record prevents an analysis of all relevant first stage *Batson* factors.

¶ 57    It was defendant's obligation to present the trial court with *all* relevant facts from which a *prima facie* case of discrimination could be inferred. Defendant failed to make a complete presentation and failed to properly preserve the relevant facts to allow for an all-encompassing inquiry on appeal. Accordingly, defendant has failed to demonstrate the trial court's rulings on the *Batson* objections were against the manifest weight of the evidence.

¶ 58                                    CONCLUSION

¶ 59    For the foregoing reasons, we affirm defendant's convictions.

¶ 60    Affirmed.

---

[5]In the last paragraph of his brief, defendant states "the trial court improperly applied a 'systematic exclusion' standard as its basis for summarily denying defense counsel's motion." We are aware that the trial court made passing reference to "systematic exclusion," which references pre-*Batson* case law. See *Swain v. Alabama*, 380 U.S. 202 (1965). Any argument that the trial court applied the wrong standard has been forfeited because defendant failed to object below (*People v. Wiley*, 156 Ill. 2d 464, 472-73 (1993)), and the mere passing reference means the issue has been forfeited for being insufficiently briefed (*People v. Nere*, 2018 IL 122566, ¶ 25 (citing Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2012))).

[6]While Brown is identified as an African-American, the record indicates one or two other individuals on the petit jury were African-American, but they are not identified for the record.