2021 IL App (1st) 190951-U

No. 1-19-0951

Order filed March 31, 2021

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 7993 |
| | ) | |
| BRANDON CONWAY, | ) | Honorable |
| | ) | Timothy J. Joyce, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BURKE delivered the judgment of the court.
Presiding Justice Howse and Justice Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's conviction for aggravated battery of a peace officer is affirmed over his contention that the State failed to establish that he knowingly or intentionally caused the complaining officer's injuries.

¶ 2    Following a bench trial, defendant Brandon Conway was found guilty of one count of resisting or obstructing a peace officer (720 ILCS 5/31-1(a-7) (West 2018)) and four counts of aggravated battery of a peace officer (720 ILCS 5/12-3.05(d)(4)(i), (ii), (iii) (West 2018)). The

trial court merged the guilty findings into one count of aggravated battery of a peace officer and sentenced defendant to 2 years of probation and 10 days in jail. On appeal, defendant argues that he was not proven guilty beyond a reasonable doubt because the State's evidence did not establish that he knowingly or intentionally caused the complaining officer's injuries. We affirm.

¶ 3     Defendant was charged with six counts of aggravated battery of a peace officer and one count of resisting or obstructing a peace officer. Count I, in particular alleged that defendant committed aggravated battery of a peace officer when he intentionally or knowingly struck and scratched United States postal inspector Derrick Jones, causing bodily harm, at such time that defendant knew Jones's office and Jones was engaged in an official duty. See 720 ILCS 5/12-3.05(d)(4)(i) (West 2018). Prior to trial, the State nol-prossed two counts of aggravated battery of a peace officer.

¶ 4     United States postal inspector Jason Jamerson testified that on the evening of May 31, 2018, he and fellow postal inspectors Alvin Devorak and Derrick Jones responded to a call at the O'Hare processing facility. Jamerson wore a bulletproof vest with the words "police postal inspector" on the front and "police" on the back, and had handcuffs, an extra firearm magazine, and a badge clipped to his belt. Affixed to the vest was a postal inspector badge. His colleagues were dressed similarly. Once inside the facility, Jamerson and the other inspectors learned that a manager wanted to suspend an employee and have him removed from the building. At trial, Jamerson identified defendant as that employee.

¶ 5     Once defendant was identified, the inspectors approached him at his machine in the processing area, asked him to "come down," and said it was time to leave. Defendant complied, but said that he wanted to speak to a female supervisor. Jamerson told defendant that he needed to

leave. Defendant then tried to walk toward the female supervisor and Jones stepped about six inches to the side to stop him. There was "slight body contact" between Jones and defendant. Defendant stopped, stepped back, and moved again, this time with his left arm "a bit up." Defendant's arms were then against Jones's vest. When defendant stepped back again, Jamerson reached for his left arm. Defendant "flailed" with his arm, yelled "get the f*** off me," and tried to remove his sweatshirt. The inspectors pulled defendant to the ground in order to restrain him.

¶ 6    Once on the ground, defendant continued to "flail" and yell. Jones was on defendant's left side trying to handcuff his left wrist. Although Jones told defendant to stop resisting and to give Jones his hand, defendant yelled at Jones to get Jones's feet out of his face and struck Jones in the back with his left knee. Jamerson explained that Jones was kneeling, and although the back of his shoe was facing defendant, the shoe was not touching defendant's face. Jamerson placed a handcuff on defendant's right wrist. Devorak then twisted defendant's feet and held him tightly. Jones cuffed defendant's other wrist, and with Jamerson, linked these cuffs together at the top of defendant's head.

¶ 7    Jones testified that after Jamerson asked defendant to leave, defendant did not react to Jamerson; rather, defendant approached Jones. Defendant then pointed "across" Jones's chest and said he needed to speak to someone. Jones responded that defendant needed to speak to the inspectors. At this point, defendant "bumped" into Jones with his chest as if trying to push Jones. Jamerson then made contact with defendant's arm, and defendant responded by saying "get the f*** off me" and pulling away. When Jamerson reached for defendant again, defendant moved away, and they all fell to the ground. Jones explained that Jamerson was holding defendant's left

arm and as defendant moved away and tried to "take off," defendant pulled Jamerson and caused "all" of them to fall to the ground.

¶ 8    Once on the ground, defendant continued to pull away despite verbal commands to stop resisting, so the inspectors tried to handcuff him. Defendant tried to pull his legs and arms away, including trying to put his arms under his body. At one point, while Jones was facing away from defendant and trying to put a handcuff on his arm, defendant said, "get your foot out of my face" and kneed him in the back. Jones felt a "jolt" and moved forward. Devorak then grabbed defendant's legs. After another 5 to 10 minutes, the inspectors handcuffed defendant. Defendant then told Jones that as soon as he was uncuffed, he would "kick [Jones's] ass." Later that evening, Jones observed a four-inch scratch on his right forearm. He did not have this mark when the inspectors started "attempting" to arrest defendant.

¶ 9    Chicago police detective Brian McMann testified that he met with defendant around 11:30 p.m. on May 31, 2018, and advised him of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). During a subsequent interview, defendant stated that he was approached by three postal inspectors who then grabbed his arms, pointed to him, and said "let's go." Defendant knew whom the inspectors were and saw their vests. He pulled away from them because he did not like people grabbing him or putting their hands on him. During cross-examination, McMann acknowledged that while defendant stated he tried to pull away, defendant did not state that he struck anyone.

¶ 10    Defendant testified that in May 2018, he had worked for the postal service for almost three years and wore a "running mask" daily because of the dust and pollen in the air. No one ever said anything about the mask. On May 31, 2018, his manager called the police because defendant did not remove his mask when asked. Chicago police officers were called, but left without doing

anything. After defendant's break, three men approached him. Defendant did not see their vests and badges because of how they approached. Defendant explained that he "just felt" someone approach from the side and was "basically just grabbed." He denied bumping or touching Jones. The inspectors did not announce themselves; rather, they grabbed him and pulled him to the ground. Once on the ground, his mask covered his face and he could not breath or see. He felt someone put a knee in his back and someone else "stick***" him on the side of the neck. Defendant denied striking the inspectors or pushing them away.

¶ 11    While on the ground, defendant tried to take his mask off and told the inspectors to get the "f***" off him. Defendant put an arm underneath himself to reach up and remove his mask. He was unable to move his legs because they were held from behind. Defendant admitted that he did not let the inspectors handcuff him, but he did not try to strike or hit anyone. Ultimately, he was cuffed and taken to a police station. He did not remember telling McMann that he tried to pull away from the inspectors.

¶ 12    During cross-examination, defendant testified that when the inspectors approached him, he thought they were other employees. Although he did not initially see the inspectors' vests, he noticed them when he was on the ground. He did not turn around when Jones said, "come with us." He told McMann that he had worn the mask for three years to keep dust out of his mouth. He had never been disciplined for wearing the mask or asked to remove it, although he knew that "they" did not like him wearing it. Defendant explained that he was harassed, followed, and asked to do tasks that were not asked of other employees. The inspectors did not say anything about the mask. Rather, he was put on the ground and Jones put a knee on his neck. Defendant tried to take the mask off his face and get up.

¶ 13    The State recalled Jamerson in rebuttal. Jamerson testified that when he first observed defendant, defendant was not wearing a mask; rather, the mask was in defendant's pocket.

¶ 14    During closing argument, trial counsel argued that the struggle resulted from the postal inspectors' actions, and although Jones was kneed by defendant, that contact was not intentional. According to counsel, the inspectors did not identify themselves and defendant did not say anything threatening until after Jamerson tried to grab his arm. Counsel concluded that the inspectors were "too aggressive" and triggered a response in defendant that led to all of them falling to the ground and causing Jones's abrasion.

¶ 15    The State responded that defendant's testimony was not credible, noting that it was convenient to testify that he did not look at the person who asked him to leave, as he would have seen the "big ole [*sic*] police insignia" on the vest. The State argued that defendant was mad that the inspectors asked him to leave, resisted, and that his resistance proximately caused Jones's injury. The State concluded that defendant's statement to Jones to move his foot right before defendant kneed him showed defendant's intent.

¶ 16    In finding defendant guilty of four counts of aggravated battery of a peace officer and one count of resisting or obstructing a peace officer, the court stated it believed the State's witnesses and did not believe defendant. The court merged its guilty findings into count I for aggravated battery of a peace officer, and following a hearing sentenced defendant to 30 days in jail and 2 years of probation. Defendant filed a motion to reconsider sentence. The court then sentenced defendant to 2 years of probation and 10 days in jail.

¶ 17 On appeal, defendant contends that he was not proven guilty of aggravated battery of a peace office beyond a reasonable doubt when the evidence at trial failed to establish that his physical contact with Jones was knowing or intentional.

¶ 18 When reviewing a challenge to the sufficiency of the evidence, "the question is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from the facts presented at trial. *McLaurin*, 2020 IL 124563, ¶ 22. "In reviewing the evidence, this court will not retry the defendant, nor will we substitute our judgment for that of the trier of fact." *Id*. A defendant's conviction will be reversed only when the evidence is so unreasonable, improbable, or unsatisfactory that it created a reasonable doubt of his guilt. *People v. Newton*, 2018 IL 122958, ¶ 24.

¶ 19 As charged in this case, the State alleged that defendant committed aggravated battery of a peace officer in that while committing a battery, he intentionally or knowingly caused bodily harm to Jones, when he struck and scratched Jones about the body knowing Jones to be a United States postal inspector engaged in the performance of an official duty. 720 ILCS 5/12-3.05(d)(4)(i) (West 2018). A person commits a battery when he knowingly without legal justification by any means causes bodily harm to an individual or makes physical contact of an insulting or provoking nature with an individual. 720 ILCS 5/12-3 (West 2018). Defendant does not claim that he did not know that Jones was a postal inspector performing an official duty. Rather, he argues that the evidence at trial did not establish that he knowingly or intentionally caused Jones's injuries.

¶ 20    Here, the testimony of Jones and Jamerson established that when defendant tried to go around Jones, Jamerson reached for defendant's left arm. Defendant reacted by flailing his arms and yelling, causing defendant, Jones, and Jamerson to fall to the ground. Once there, defendant continued to flail and yell despite being told to stop resisting and give Jones his hand. As Jones kneeled at defendant's side trying to handcuff him, defendant yelled at Jones to get Jones's foot out of his face and then kneed Jones in the back, which caused Jones to feel a jolt and move forward. Jones later observed a four-inch scratch on his right forearm. Here, taking the evidence at trial in the light most favorable to the State, we cannot say that no rational trier of fact could have found defendant guilty of aggravated battery of a peace officer when defendant did not comply with the inspectors' order, flailed his arms causing Jones and Jamerson to fall to the ground with him, and kneed Jones in the back. *McLaurin*, 2020 IL 124563, ¶ 22.

¶ 21    Defendant nonetheless contends that even accepting Jones's and Jamerson's testimony as true, that evidence did not give rise to a "reasonable inference" that defendant knowingly made physical contact with Jones. He argues that physical contact alone is not sufficient to establish battery; rather, the contact must be knowing and intentional.

¶ 22    A person acts knowing the result of his conduct—in the case at bar, causing bodily harm by any means—when he is consciously aware that his conduct is practically certain to cause that particular result. 720 ILCS 5/4-5 (West 2018); *People v. Castillo*, 2018 IL App (1st) 153147, ¶ 26. Generally, knowledge is established through circumstantial evidence rather than direct proof. *Castillo*, 2018 IL App (1st) 153147, ¶ 26; *People v. Jamison*, 2018 IL App (1st) 160409, ¶ 27 ("Since 'knowingness' is a state of mind, it will rarely be proven by direct evidence."). Accordingly, "the State will often have to prove 'knowingness' based on the surrounding

circumstances of the event, 'including the character of the assault and the nature and seriousness of the injury.' " *Jamison*, 2018 IL App (1st) 160409, ¶ 27 (quoting *People v. Williams*, 165 Ill. 2d 51, 64 (1995)). When determining whether a defendant's actions caused bodily harm, direct evidence of an injury may be considered or "the trier of fact may infer injury based on circumstantial evidence in light of common experience." *People v. Bishop*, 218 Ill. 2d 232, 250 (2006).

¶ 23    Here, the inspectors testified that defendant did not comply with their requests to leave the building or stop resisting, flailed his arms, and struggled with the inspectors, causing Jones, Jamerson, and defendant to fall to the ground. Jones testified that immediately after defendant told him to get his feet out of defendant's face, he felt a jolt as defendant kneed him in the back and later found a four-inch scratch on his arm. It is reasonable to infer defendant knew that flailing about and struggling with someone to the extent that all involved fall to the ground will result in some type of injury. Thus, the State presented sufficient evidence that defendant knowingly and intentionally caused Jones's injuries.

¶ 24    We are unpersuaded by defendant's reliance on *People v. Jackson*, 2017 IL App (1st) 142879. In that case, the defendant called 911 and requested an ambulance. When the paramedics arrived, they found the defendant acting nervous and " 'not rational,' " as though he were "suffering from some type of psychological issue." *Id*. ¶ 11. According to the paramedics, the defendant could not follow simple directions and did not seem to be thinking clearly. *Id*. The defendant refused to go with the paramedics and yelled they were " 'not the ambulance.' " *Id*. ¶ 10. The paramedics then contacted the police. When the police arrived, the defendant punched and kicked the officers as though " 'defending' " himself. *Id*. ¶ 13. One of the officers then tased the

defendant approximately 10 times. *Id*. During this struggle, the defendant kicked one of the officers in the lower legs. *Id*. ¶ 14. The defendant was subsequently convicted of battery and resisting a police officer. *Id.* ¶ 19.

¶ 25 On appeal, this court reversed the defendant's conviction, finding that the State had presented "little-to-no evidence that [the defendant] behaved 'knowingly.' " *Id*. ¶ 27. In coming to this conclusion, we noted that the paramedics described the defendant as nervous and agitated, one paramedic believed that the defendant had an "altered" mental state, the injured officer characterized the defendant's behavior as irrational, and despite the fact that the paramedics were in uniform and driving an ambulance, the defendant repeatedly denied that they were actually paramedics. *Id*. ¶ 26. Based on this evidence, we found that the defendant, who appeared to have been " 'defending' " himself, could not have been " 'consciously aware' " that his actions would result in kicking the officer, or even that the person he was kicking was in fact a police officer, as required under the statute. *Id*. ¶ 27.

¶ 26 We further explained that when a defendant behaves " 'normally' " it is easy to make an inference that he "knows," *i.e.*, he is " 'consciously aware,' " of the consequences of his actions. *Id.* ¶ 29. However, under the circumstances of that case, where the State's witnesses all testified that the defendant was not behaving " 'normally,' " it was impossible to infer from the defendant's actions that he was " 'consciously aware' " of his actions and their results. *Id.*

¶ 27 In the case at bar, unlike *Jackson*, none of the witnesses testified that defendant was acting abnormally, irrationally, or that he appeared to be in an altered state so as to permit the inference that he was not "consciously aware" of what he was doing or the results of his actions. While defendant may have been acting out of "his own self-preservation instincts," as he argues before

his court, the fact remains that defendant kneed Jones immediately after yelling at Jones to move his foot while struggling with the inspectors and disregarding their orders. When weighing evidence, the trier of fact is not required to disregard inferences flowing naturally from the evidence before it, nor need it search out all possible explanations consistent with innocence and raise them to the level of reasonable doubt. *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60. A defendant's conviction will be overturned only if the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of his guilt (*Newton*, 2018 IL 122958, ¶ 24); this is not one of those cases. We therefore affirm defendant's conviction for aggravated battery of a peace officer.

¶ 28    For the forgoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 29    Affirmed.