2020 IL App (1st) 162937-U

No. 1-16-2937

Order filed June 25, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 18177 |
| | ) | |
| KAZ LINK, | ) | Honorable |
| | ) | Joseph M. Claps, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Gordon and Justice Reyes concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial court did not abuse its discretion when it limited the defense psychiatric expert witness's use, during his trial testimony, of excerpts of defendant's statements in his videotaped post-arrest interview with the police, not to prove the truth of the matter asserted therein, but rather to explain the basis of the expert's opinion that defendant was legally insane when he murdered the victim. Also, defendant did not meet his burden to demonstrate that the trial judge, based on a comment he made before the jury, was biased against the defense expert witness.

¶ 2    After a jury trial, defendant Kaz Link was found guilty of first degree murder and sentenced to a prison term of 65 years.

¶ 3    On appeal, defendant argues the trial court violated his right to fully present his insanity defense by (1) denying his request to visually show the jury, during the testimony of his psychiatric expert, excerpts of defendant's post-arrest statements in his videotaped interview with the police through the defense's use of a PowerPoint presentation and by playing portions of the videotaped interview; and (2) characterizing the defense's psychiatric expert witness's testimony as "nonsense." Defendant also argues that he should receive a new trial before a different judge because the trial court exhibited hostility toward defendant's insanity defense and expert witness.

¶ 4    For the reasons that follow, we affirm the judgment of the circuit court.[1]

¶ 5                        I. BACKGROUND

¶ 6    Defendant was indicted for attempted aggravated vehicular hijacking and the first degree murder of Dennis Fox, a security guard at a gas station and convenience store on South Pulaski Avenue in Chicago.

¶ 7    At the jury trial, the State's evidence showed that in October 8, 2011, defendant entered the convenience store about 3 a.m. and purchased doughnuts and water. At that time, Fox was working as an armed security guard, Mohammed Saadeh was working as a cashier, and Darnell Graham was working as a janitor. Several other people, including regular customers, were also in the store.

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 8    Defendant loitered in the store for about one hour, talking on his phone and standing sometimes near the cashier area and sometimes near the exit. Saadeh spoke to Fox about defendant because he was not a regular customer. Fox briefly spoke to defendant, who then followed Fox around inside the store. Fox telephoned 911, requesting police assistance due to the problem he was having with defendant. A few moments after Fox put down his phone, defendant approached him and began stabbing him. Saadeh hit the emergency alarm and telephoned 911. Fox attempted to cover his face and move away from defendant, who continued to stab Fox under his arm. Fox tripped over some cases of soda and fell to the floor. Defendant got on top of Fox and continuously stabbed him. Saadeh, Graham, and another cashier yelled at defendant to get off of Fox, but defendant did not say anything.

¶ 9    Graham obtained a baseball bat from the cashier area, approached defendant, and told him to get off of Fox. Defendant told Graham to leave or defendant would kill him too. Graham hit defendant in the face with the bat, but defendant did not move. Fox was lying on his side and reaching for his gun, but defendant took it from him. Graham dropped the bat and ran from the store. Defendant shot Fox twice and walked to the door. However, defendant turned around, walked back to Fox, picked up a phone and kicked Fox in his head.

¶ 10    Outside the store, Cassandra Stewart and another woman were sitting in a car parked at a gas pump. Defendant ran towards the car, pulled out a gun and pointed it at the women, and told them to get out of the car. Stewart exited the car and ran from the scene. She flagged down a police car and pointed to the gas station.

¶ 11    Police officers arrived at the gas station within one minute of the shooting. Defendant was standing in the gas station lot, covered in blood. While one officer approached defendant, another

officer went inside the store. Defendant placed two handguns and a cellphone on the ground and raised his arms in the air. He told the approaching officer, "I shot him. It was in self-defense." Defendant did not threaten or make any aggressive movement toward the police officers.

¶ 12     When Stewart returned to the scene, she identified defendant, who was lying on the ground, to the police. Fox died from the injuries inflicted by defendant. An ambulance at the scene treated defendant, who had a cut on his right palm and a cut to his left little finger. Police officers interviewed defendant at the police station, and those interviews were videotaped.

¶ 13     The police recovered from the scene a cellphone, a bloodstained knife with a broken tip, a bloodstained revolver, and a bloodstained BB gun that resembled a semi-automatic handgun. The revolver was operable and contained two fired cartridge cases and four unfired cartridges. The bullet and bullet jacket the medical examiner recovered from Fox's body were fired from the revolver. The store's video surveillance system recorded defendant stabbing and shooting Fox. The DNA evidence indicated that Fox and defendant's DNA were on the knife or the revolver.

¶ 14     The autopsy of Fox's body revealed one gunshot wound to the right inferior chin, a second gunshot wound to the right inferior chest, and over 17 stab and incise wounds, which included the areas of the scalp, left shoulder, center chest and right lung. A knife tip was recovered from the frontal bone at the location of a stab wound to the right frontal scalp.

¶ 15     After the State rested its case-in-chief, Dr. James Corcoran testified for the defense as an expert in forensic psychiatry. He reviewed records regarding this case, including video footage of the crime scene, grand jury transcripts, police reports, defendant's medical records, witness statements, a video statement log of defendant, and prison records. After reviewing the records, Dr. Corcoran interviewed defendant for about three hours on June 13, 2014. During the interview,

defendant related that he had seen a psychiatrist when he was eight or nine years old due to behavioral problems and started hearing voices when he was about 13 years old. Defendant's records, however, did not show any prior psychiatric hospitalizations, which Dr. Corcoran noted was unusual but not unprecedented. After defendant's incarceration in this case, he was prescribed various anti-psychotic medications.

¶ 16     According to defendant's narrative of the events to Dr. Corcoran, defendant heard voices on the date of the offense that told him "to go talk to people" and other "things" defendant could not remember. He went to a party where he drank alcohol and smoked PCP. He could not go home after the party because he felt paranoid, so he went to the convenience store instead. A voice he could not resist told him to kill, so he stabbed and shot Fox. The voice "stopped after [defendant] stabbed the guy." Voices also told defendant to take the car. Based upon defendant's narrative, Dr. Corcoran concluded that defendant described command auditory hallucinations.

¶ 17     Dr. Corcoran identified the particular statements defendant made during his videotaped police interview that Dr. Corcoran found to be psychiatrically relevant. During his testimony on this topic, Dr. Corcoran reiterated verbatim those particular statements and then explained why he found those statements to be psychiatrically relevant. Dr. Corcoran concluded that defendant suffered from a mental disease and lacked a substantial capacity to appreciate the criminality of his conduct due to that mental disease. Dr. Corcoran did not have a formal diagnosis for defendant but concluded that he experienced an episode of psychosis with severe delusional paranoia. Dr. Corcoran further concluded that defendant lacked a substantial capacity to appreciate the criminality of his conduct "[d]ue to his symptoms during his psychotic episode." Specifically, defendant had "a delusional belief that he was going to be killed and he needed to kill someone in order to prevent that from happening."

¶ 18    In the State's rebuttal case, Dr. Alexis Mermigas testified as an expert in forensic psychiatry. Prior to meeting defendant, Dr. Mermigas reviewed numerous documents, including the referral order, court documents, grand jury transcripts, police reports, defendant's videotaped statement, video of defendant in the holding cell, the gas station surveillance video inside and outside the store, defendant's criminal history, an evaluation report from a psychologist at Forensic Clinical Services; Dr. Corcoran's report; hospital medical records, prison medical and administrative records, and the jail's medical records.

¶ 19    On November 3, 2015, Dr. Mermigas interviewed defendant for approximately 1.5 hours. During that interview, they discussed defendant's background information, medical history, substance abuse history, and mental health history. Dr. Mermigas found it unusual that defendant did not have any history of psychiatric hospitalizations and had not been admitted to an inpatient locked facility. Although defendant reported that he had seen a psychiatrist for behavioral problems from the age of about 7 until the age of about 13, defendant was not prescribed any medication and could not recall if he had a psychiatric diagnosis at that time. Defendant reported that he next saw a psychiatrist and was prescribed medication while incarcerated in 2009. However, Dr. Mermigas testified that defendant first received "real psychiatric treatment of any kind" in 2011 after he was arrested for the offense at issue here.

¶ 20    Defendant told Dr. Mermigas that he heard male and female voices continuously, and the voices woke him from sleep and caused ringing in his ears and frontal headaches. Dr. Mermigas was skeptical about defendant's description of his auditory hallucinations because it did not make sense. Ringing ears and headaches were not symptoms of this condition and continuous voices were a very rare experience. Furthermore, any child who heard voices at such a young age "would be seriously chronically ill" and most likely suffer from schizophrenia or schizoaffective disorder

but defendant "did not look anywhere near ill enough to qualify for that." In addition, auditory hallucinations do not talk to the person and very rarely give commands. If a voice gave a negative command, the person would resist because "people don't want to act in ways that are wrong." Moreover, the visual hallucinations defendant described, such as seeing a little green man, were even rarer and more typical of being drug-induced by hallucinogens like LSD or PCP. Dr. Mermigas explained that delusions are very fixed beliefs and opined that delusions are sometimes the most difficult thing to treat, even with antipsychotic medication, in a person with true psychosis.

¶ 21    According to defendant's description to Dr. Mermigas of the events on the date in question, defendant did not hear voices that day but had a visual hallucination of his deceased sister, who told him to "stay out of trouble and take care of mama." Defendant smoked several joints of marijuana that afternoon and evening, drank one Long Island Iced Tea, and may have smoked PCP. He began feeling paranoid after he drank the alcoholic drink and thought someone at the party had slipped something into his drink. He went to his mother's home and thought someone was holding his family hostage, so he walked to the gas station, which was "a safe zone." He stayed at the gas station even though he thought everyone was watching him and going to kill him. The last thing defendant could recall before he "blanked out" was Fox walking down a store aisle. Defendant's next memory was being handcuffed and put into a police car.

¶ 22    Dr. Mermigas diagnosed defendant with malingering, which was not a psychiatric condition *per se*. She opined that defendant was faking the symptoms of psychotic illness to avoid punishment for his offense. She stated that the records she reviewed also contained evidence of malingering. She found that defendant was legally sane at the time he committed the offense and

was not suffering from any mental disease or defect that would have prevented him from understanding the criminality of his conduct.

¶ 23    On cross-examination, Dr. Mermigas described defendant's behavior while in custody as appropriate, noting that he was calm and answered questions. She opined that the fear defendant described was caused by PCP intoxication. She also opined that defendant's getting hit in the head with the baseball bat did not impact his mental state and would not have contributed to a mental disease at that time. Furthermore, no medical evidence indicated that defendant suffered a head injury. Defendant was prescribed antipsychotic medication when Dr. Mermigas interviewed him. According to a November 2012 note in the records of the Cook County jail's health facility, defendant was prescribed a trial of Risperdal "to reduce and prevent violent behavior" even though he had "no credible syndromal range symptoms to support the diagnosis of bipolar or schizophrenia." The jail's medical records reflected that defendant was given a probable diagnosis of schizoaffective disorder, but the doctors documented no psychotic symptomology. Dr. Mermigas noted that prison records described defendant as "highly manipulative."

¶ 24    Dr. Nicholas Jasinski testified for the State as an expert in forensic psychology. Prior to meeting defendant, Dr. Jasinski reviewed reports from the police, jail and prison, the video surveillance of the offense, defendant's videotaped statement and criminal history records, the grand jury transcripts, and Dr. Corcoran's report. Dr. Jasinski found that defendant had no prior mental health history and no indication of any hospitalizations for psychiatric reasons or psychiatric treatment. Dr. Jasinski found it atypical that defendant had not received any prior mental health treatment based on the psychotic symptoms he reported experiencing. Defendant did not exhibit or complain of any mental health issues when he was examined at the hospital on the day of the offense and did not require a mental health assessment two days later. Six days after the

offense, defendant "reported feeling bad about his case." However, it was not until November 3, 2011, while in Stateville Correctional Center, that defendant reported feeling paranoid. Moreover, a note dated November 17, 2011, indicated that defendant appeared to be "demanding and manipulating," had "[n]o clear mental health issues," and appeared to exhibit "clearly manipulative behavior." Dr. Jasinski opined that, based upon his review of defendant's records, defendant did not suffer any mental illness, such as schizophrenia, psychosis, mania, or bipolar disorder. Dr. Jasinski noted in the records a diagnosis of "probable schizoaffective" and that defendant had received psychotropic medications; that medication, however, was prescribed to control violent behavior rather than symptoms of mental illness. Based on his review of the records, video and witness accounts, Dr. Jasinski did not find any "overt evidence of disorganized behavior" or "strange actions."

¶ 25    Dr. Jasinski met with defendant on three occasions and described him as "calm, cooperative, logical, and coherent." Dr. Jasinski administered psychological testing to defendant and opined that the results were "unequivocally indicative of an individual exaggerating or malingering psychopathology." Some test results were not even interpretable due to defendant's exaggeration of symptoms. Dr. Jasinski subsequently diagnosed defendant with malingering and antisocial personality disorder. Dr. Jasinski opined that defendant was legally sane at the time of the offense. Dr. Jasinski also opined that, based upon his review of the records, his interviews with defendant and the results of defendant's psychological testing, there was no indication that defendant had a mental disease that would "produce a brief episode of psychosis."

¶ 26    After closing arguments, the court instructed the jury. The jury found defendant guilty of the first degree murder of Fox.

¶ 27                                    II. ANALYSIS

¶ 28                A. Exclusion of Hearsay Evidence and the State of Mind Exception

¶ 29    First, defendant argues the trial court deprived him of the right to present a complete defense when the court denied his request to present during Dr. Corcoran's testimony video and text excerpts from defendant's post-arrest videotaped statement. Defendant argues that his expert should have been allowed to publish to the jury portions of the videotape and corresponding text to explain how defendant's videotaped behavior showed evidence of a paranoid and delusional state of mind.

¶ 30    According to the record, the State objected prior to Dr. Corcoran's testimony to the defense's plan to publish some of defendant's videotaped statement through the doctor. Defense counsel explained that he intended to publish to the jury during Dr. Corcoran's testimony videotaped excerpts from defendant's interview at the police station that Dr. Corcoran found to be psychiatrically relevant. The defense argued that defendant's paranoid delusional statements were not hearsay because the defense did not seek to admit them for the truth of the matter asserted, but rather to show defendant's state of mind and the extent of his paranoia and delusions.

¶ 31    The State objected and argued that the evidence was inadmissible hearsay and would confuse the jury if the defense was allowed to use excerpts of defendant's post-arrest statement to show that he was in fact paranoid about something.

¶ 32    The trial court ruled that Dr. Corcoran could read to the jury the specific excerpts from defendant's police station interview that Dr. Corcoran had used to formulate his opinion; however, defense counsel could not publish to the jury either videotaped or transcript excerpts of defendant's police station interview. The court stated that the jurors were not trained forensic psychologists or

psychiatrists and it did not make sense for the jurors to watch the videotape to see the material the experts had viewed to form their opinions. The court concluded that defendant's request to publish excerpts from his prior statement improperly attempted to get portions of his statement to the police before the jury and bootstrap that statement into substantive evidence. The court found that allowing defendant's request would confuse the jury and portray defendant's statement in a manner that would be far more prejudicial than probative. In addition, prior to Dr. Corcoran taking the stand, the trial court provided a limiting instruction to the jury and informed them that the information or facts relied upon by an expert witness was not evidence.

¶ 33 The right to present an insanity defense does not give defendant an unfettered right to introduce irrelevant evidence or offer testimony that is incompetent, privileged, or otherwise inadmissible under the standard rules of evidence. *In re Melcher*, 2013 IL App (1st) 123085, ¶ 44; *Taylor v. Illinois*, 484 U.S. 400, 410 (1988). The parties "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers v. Mississippi*, 410 U.S. 284, 301 (1973).

¶ 34 Evidentiary rulings are within the sound discretion of the trial court and will not be reversed unless the trial court has abused that discretion. *People v. Reid*, 179 Ill. 2d 297, 313 (1997). "[W]hen a party claims he was denied the constitutional right to present a complete defense due to improper evidentiary rulings, the standard of review is abuse of discretion." *People v. Burgess*, 2015 IL App (1st) 130657, ¶ 133. An abuse of discretion occurs when the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991).

¶ 35    Defendant argues that the ruling at issue here should be subject to *de novo* review because the deprivation of a defendant's right to present a defense is a constitutional issue. We reject defendant's argument and review the challenged evidentiary ruling with deference to the trial court. The decision whether to admit evidence cannot be made in isolation; the trial court must consider a number of circumstances that bear on that issue, including questions of reliability and prejudice. See *People v. Caffey*, 205 Ill. 2d 52, 89-90 (2001). In this case, the trial court exercised discretion in making the challenged evidentiary ruling, *i.e.*, the court based its ruling on the specific circumstances of this case.

¶ 36    Hearsay is an out of court statement offered to prove the truth of the matter asserted. *People v. Gonzalez*, 379 Ill. App .3d 941, 954 (2008). Hearsay is generally inadmissible due to its lack of reliability and the inability of the opposing party to confront the declarant unless it falls within an exception to the hearsay rule. *People v. Cook*, 2018 IL App (1st) 142134, ¶ 34. At trial, it is impermissible hearsay for a defendant to introduce his prior statements because the testimony is not offered as a statement against a party but is offered to prove the truth of his own statement. *People v. Pasch*, 152 Ill. 2d 133, 197 (1992). Expert witnesses can give their opinion based upon facts that are not in evidence if those facts are a type reasonably relied upon by experts in the particular field. *Id.* at 175. However, the underlying facts and data may be disclosed by an expert for the purpose of explaining the basis for his opinion, but not for the truth of the matter asserted. *People v. Williams*, 238 Ill. 2d 125, 143 (2010).

¶ 37    The record establishes that, during his testimony, Dr. Corcoran read extensively from defense counsel's prepared PowerPoint presentation, which was based upon excerpts from defendant's videotaped statement. Accordingly, the jury knew defendant's version of the

occurrence at the store, that he asked the police about the status of his parents and their house during his videotaped interview at the police station, and that he told the police he thought people at the gas station and store were staring at him. Dr. Corcoran's testimony also included explanations about the significance of defendant's facial expressions, overall body language and tone of voice.

¶ 38    Defendant argues that the proffered hearsay statement was admissible because it falls within the state-of-mind exception to the hearsay rule. See *People v. Floyd*, 103 Ill. 2d 541, 546 (1984) (statements that indicate the declarant's state of mind are admissible as exceptions to the hearsay rule when the declarant is unavailable to testify, there is a reasonable probability that the proffered hearsay statements are truthful, and the statements are relevant to a material issue in the case). However, even if defendant's hearsay statement was admissible to show his state of mind, any error in excluding it was harmless because publishing to the jury selective portions of defendant's videotaped statement and its corresponding text would have been merely cumulative evidence since the trial court allowed Dr. Corcoran to read those statements verbatim to the jury when he testified about the basis of his opinion regarding defendant's sanity. See *People v. Ortiz*, 235 Ill. 2d 319, 335 (2009) (evidence is cumulative if it adds nothing to what was already presented to the jury); *People v. Bartall*, 98 Ill. 2d 294, 318-20 (1983) (a court's error in excluding admissible evidence is harmless if the excluded evidence was merely cumulative). Furthermore, even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issue or misleading the jury. See Ill. R. Evid. 403 (eff. Jan. 1, 2007).

¶ 39    We conclude that the trial court did not abuse its discretion when it (1) allowed Dr. Corcoran to read to the jury the excerpts of defendant's videotaped statement that Dr. Corcoran

considered to be psychiatrically relevant in reaching his conclusion about defendant's sanity at the time of the offense, and (2) precluded the defense from showing the jury select portions of the videotaped statement and corresponding text from the transcript of the video tape.

¶ 40                                    B. Trial Judge's Alleged Bias

¶ 41    Next, defendant argues that he is entitled to a new trial before a different judge because the trial court was biased against defendant's expert witness, Dr. Corcoran. Defendant claims that the court's bias was established when the court attacked Dr. Corcoran's credibility in front of the jury and dismissively characterized parts of his testimony as "nonsense."

¶ 42    A defendant's right to an unbiased, open-minded trier of fact is fundamental. *People v. Harris*, 384 Ill. App. 3d 551, 560 (2008). "A trial judge is presumed to be impartial, and the burden of overcoming this presumption rests on the party making the charge of prejudice." *People v. Faria*, 402 Ill. App. 3d 475, 482 (2010). "In order to demonstrate bias or prejudice by the trial judge, the record must establish that there was an active personal animosity, hostility, ill will, or distrust toward the defendant." *People v. Harris*, 384 Ill. App. 3d at 563. A showing of irritation or displeasure, with nothing more, does not lead to a conclusion that the trial court was biased against defendant. *Faria*, 402 Ill. App. 3d at 482. Moreover, it is "the trial court's responsibility to achieve a prompt and convenient dispatch of court proceedings." *Id*. at 479.

¶ 43    A verdict will be disturbed only where a trial judge's comments prejudiced defendant such that the comments constituted a material factor in the conviction. *People v. Johnson*, 2012 IL App (1st) 091730, ¶ 76; *People v. Lopez*, 2012 IL App (1st) 101395, ¶ 57. When this court evaluates an allegation of bias based upon a trial judge's remark, we review the entire context of the remark and evaluate it in terms of the events taking place or the trial judge's specific reaction to the

witness. *Faria*, 402 Ill. App. 3d at 482; *People v. Martin*, 285 Ill. App. 3d 623, 632 (1996) (citing *People v. Hannon*, 48 Ill. 2d 462 (1971)). Consequently, even improper remarks by a trial judge may be harmless error. *People v. Williams*, 209 Ill. App. 3d 709, 718-19 (1991).

¶ 44     The record establishes that the trial court allowed Dr. Corcoran, as he opined that defendant appeared paranoid, to render his opinion regarding the significance of certain excerpts of defendant's post-arrest statement, like his belief that his family was not safe. The trial court, however, sustained the State's objection when Dr. Corcoran began to summarize the discussion between defendant and a detective. Shortly thereafter, the defense attempted to circumvent the trial court's evidentiary ruling by asking Dr. Corcoran for his opinion about whether any member of defendant's family was "actually in any objective danger by anybody." The trial court again sustained the State's objection.

¶ 45     Dr. Corcoran's testimony then continued:

"Q. Doctor, in addition to evidence of paranoia, is this also evidence of delusional thinking?

A. Yes.

Q. Why?

A. Well, a delusion is a symptom of psychosis. A delusion is a fixed false belief that's not based in reality. So, in essence, to my knowledge from the materials I reviewed, there was no danger to his family. There was nobody infiltrating his mother's home. There were no gangbangers – –

THE COURT: All right. Try and answer the question that's asked. You got that part?

- 15 -

THE WITNESS: Yes, sir.

THE COURT: All right. This nonsense about whether somebody was or wasn't [in danger] has little or nothing to do with this witness's evaluation. It is the statements that [defendant] makes that's relevant. It does not establish whatsoever whether someone was or someone was not in danger. That's not the purpose of it. Comply your answers to the questions asked. Go ahead."

¶ 46    Defense counsel's question, as posed, allowed Dr. Corcoran to further offer his opinion regarding defendant's state of mind and opine that defendant's statement not only exhibited evidence of paranoia but also delusional thinking. Dr. Corcoran then defined a delusion, all of which complied with the trial court's evidentiary ruling that barred the use of defendant's videotaped statement as substantive evidence. However, Dr. Corcoran's next statement strayed beyond the scope of the question asked by defense counsel and attempted to offer substantive evidence about the truth or falsity of whether any danger was occurring within the home of defendant's family despite Dr. Corcoran's lack of personal knowledge of and inability to offer insight on the subject matter. This attempted use of defendant's videotaped statement as substantive evidence violated the trial court's evidentiary ruling and drew the trial court's "nonsense" remark as the trial court enforced that evidentiary ruling.

¶ 47    The record establishes that the trial court's "nonsense" remark did not refer to Dr. Corcoran's expert opinion regarding defendant's sanity but rather merely expressed the court's frustration with the defense's third attempt within a very short amount of time to circumvent the court's evidentiary ruling that precluded the use of defendant's videotaped statement as substantive evidence. The trial court's isolated and fleeting "nonsense" remark did not amount to judicial bias, especially where the remark did not refer to Dr. Corcoran's testimony about defendant's sanity.

¶ 48 The facts and circumstances of this case clearly show that the trial court remained impartial. Contrary to defendant's claim that the trial court "dismissively characterized the defense expert's testimony as nonsense," the trial court properly allowed into evidence significant state of mind evidence through Dr. Corcoran's testimony. The trial court's "nonsense" remark referred to the defense's attempt to present, through Dr. Corcoran's testimony, portions of defendant's post-arrest statements as substantive evidence and thereby circumvent the trial court's ruling that barred the defense from showing the jury the PowerPoint presentation and excerpts of defendant's videotaped interview at the police station. Our review of the record establishes that defendant failed to meet his burden to overcome the presumption of the trial judge's impartiality.

¶ 49 Furthermore, any error concerning the trial court's remark did not constitute reversible error; the remark was neither highly prejudicial nor a material factor in defendant's conviction in view of overwhelming evidence of his sanity. The determination of sanity is not dependent upon any particular type of testimony, expert or otherwise. *People v. Burnett*, 2016 IL App (1st) 141033, ¶ 48. Relevant factors in this determination include observations by lay witnesses made shortly before or after the crime was committed, and the defendant's plan for the crime and methods to prevent detection. *People v. Dwight*, 368 Ill. App. 3d 873, 880 (2006); *People v. Smothers*, 55 Ill. 2d 172, 175 (1973). "Bizarre behavior or delusional statements do not compel an insanity finding as a defendant may suffer mental illness without being legally insane." *People v. McCullum*, 386 Ill. App. 3d 495, 504 (2008).

¶ 50 The eyewitness testimony and store surveillance footage, which showed that defendant committed his criminal acts with deliberation and an awareness of the consequences, rendered his version of the offense—that he "blanked out" and had no recall of anything that occurred from the

time he saw Fox walk down a store aisle until the police handcuffed defendant and put him in a police car—not credible. After Graham, who was armed with a baseball bat, yelled at defendant to get off of Fox, defendant had the wherewithal to threaten to kill Graham next if he did not leave. Defendant alertly noticed Fox reach for his gun and acted deliberately when he took it away and fired it twice at Fox. Before defendant fled from the store with his knife, he turned around and walked back to Fox to pick up the two guns and the cellphone from the floor. See *People v. Abernathy*, 402 Ill. App. 3d 736, 753 (2010) (evidence that the accused attempted to conceal his actions or destroy evidence against him is admissible to show consciousness of guilt). Then defendant kicked Fox in his head, exited the store and attempted to flee the crime scene by pointing a gun at the occupants of a car and attempting to highjack the vehicle. See *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (headlong flight is the consummate act of evasion and suggestive of wrongdoing). When the police arrived at the scene, defendant claimed that he had acted in self-defense, put the weapons and cellphone down on the ground and raised his hands. See *People v. Mitchell*, 35 Ill. App. 3d l5l, 162 (1975) (defendant's false exculpatory statement has independent probative value as evidence of consciousness of guilt.).

¶ 51    Despite defendant's claim that he began hearing voices when he was about seven years old, no evidence corroborated his alleged mental illness other than his self-reported symptoms. Defendant did not have any documented mental health history or prior mental health hospitalizations, which Drs. Mermigas and Jasinski, the State's experts, and Dr. Corcoran, defendant's expert, all found unusual. See *People v. Williams*, 201 Ill. App. 3d 207, 220 (1990) (the absence of either prior mental treatment or prior irrational conduct is important in determining the sanity of the accused at the time of the offense). Defendant's first documented psychiatric

treatment occurred in 2011, after he was arrested for the offense at issue here. Furthermore, the trial medication prescribed to him was intended to control violent behavior.

¶ 52 Defendant claimed that he heard male and female voices continuously and the voices caused ringing in his ears and frontal headaches. Dr. Mermigas, however, testified that ringing ears and headaches were not symptoms of auditory hallucinations and it was very rare for someone with this condition to experience continuous voices.

¶ 53 Defendant did not mention or exhibit any alleged mental illness or symptoms thereof during his interview at the police station or when he was examined at the hospital on the day of the offense, October 8, 2011. He did not require a mental health assessment until two days later. Six days after the offense, he said merely that he felt bad about his case. The first time he mentioned feeling paranoid was November 3, 2011, while in Stateville Correctional Center. Furthermore, a note dated November 17, 2011, indicated that defendant appeared to be "demanding and manipulating," had "[n]o clear mental health issues," and appeared to exhibit "clearly manipulative behavior."

¶ 54 Although Dr. Corcoran did not provide a formal diagnosis for defendant, the doctor nevertheless opined that defendant suffered from a mental disease, lacked the substantial capacity to appreciate the criminality of his behavior, and had "experienced an episode of psychosis." In contrast, Drs. Mermigas and Jasinski, diagnosed defendant with malingering and opined that he was legally sane when he committed the offense and did not suffer from any sort of mental disease or defect that would have prevented him from understanding the criminality of his conduct. Dr. Jasinski also diagnosed defendant with antisocial personality disorder and found no indication that he had a mental disease or defect that would produce a brief episode of psychosis.

¶ 55    Based on the aforementioned evidence of defendant's sanity, we conclude that any impropriety by the trial court's "nonsense" remark was harmless and not a material factor in defendant's conviction.

¶ 56                                    III. CONCLUSION

¶ 57    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 58    Affirmed.